Parks v. State.

## PARKS v. THE STATE.

[No. 19,670.   Filed October 7, 1902.]

CRIMINAL LAW.—*Affidavit and Information.—Physicians.*—An affidavit and information, in the form prescribed by §7323c Burns 1901, charging defendant with unlawfully practicing medicine without first having procured a license so to do, sufficiently states the nature of the accusation, although under the statute various acts may enter into the offense. *pp. 213, 214.*

PHYSICIANS. — *Practicing Without License.—Evidence.*—Evidence that defendant held himself out as a magnetic healer, advertised as such, and styled himself "Professor"; that he was not a graduate of any school of medicine, and had no license; that he treated a patient for a lame ankle which he diagnosed as rheumatism, the treatment consisting in holding the afflicted parts and rubbing them, and received $1 for the treatment, was sufficient to show defendant guilty of practicing medicine without a license in violation of §§7318–7323e Burns 1901. *pp. 214, 215.*

CRIMINAL LAW.—*Good and Bad Counts of Indictment.—Presumptions on Appeal.*—Where there is one sufficient count in an indictment, and a general verdict of guilty is returned on which judgment is rendered, it will be presumed on appeal that the judgment was rendered on the good count. *p. 215.*

STATUTES.—*Amendments.—Construction.*—Where an act is amended it will be construed as though the amendments as they exist had been incorporated in the original act. *pp. 215, 216.*

CONSTITUTIONAL LAW.—*Physicians.*—*Licenses.*—*Privileges and Immunities.*—The privileges and immunities clause of the fourteenth amendment to the federal Constitution has no application to the denial of the right to practice medicine without first procuring a license as provided by §§7318-7323e Burns 1901. *pp. 216, 217.*

SAME.—*Police Power.*—*Statutes.*—*Discretion of Legislature.*—While laws enacted by a state under its police power must be wholesome and reasonable, a very large measure of authority is vested in the legislative department to determine what is reasonable and wholesome. *pp. 217-223.*

PHYSICIANS.— *Licenses.* — *Constitutional Law.*— *Classification.* —*Magnetic Healing.*—The law regulating the practice of medicine, §§7318-7323e Burns 1901, is a valid exercise of the police power of the State although it exempts physicians and surgeons legally qualified to practice in the state in which they reside, when in consultation with a legal practioner of this State; physicians and surgeons residing on the border of a neighboring State, and authorized to practice under the laws thereof, whose practice extends into the limits of this State; opticians; prevents magnetic healers from following their occupations, and permits the granting of licenses to practice osteopathy. *pp. 223-229.*

CONSTITUTIONAL LAW.—*Statutes.*—*Title.*—Section 19 of article 4 of the Constitution providing that "every act shall embrace but one subject and matters properly connected therewith" does not require that the title shall be an epitome of the act. It is the subject of the act, and not the matters properly connected therewith that the Constitution requires to be expressed in the title. *pp. 229-231.*

From Lawrence Circuit Court; *W. H. Martin,* Judge.

George P. Parks was convicted of practicing medicine without a license, and appeals. *Affirmed.*

*S. B. Peugh,* for appellant.

*W. L. Taylor,* Attorney-General, *Merrill Moores* and *C. C. Hadley,* for State.

GILLETT, J.—Appellant was prosecuted, by affidavit and information, for practicing medicine without a license. There were three counts in the affidavit and information. Appellant moved to quash each count thereof, but his motion was overruled, and he excepted. Upon issue joined, a trial was had that resulted in a finding of guilty as charged in each count. Judgment was rendered in accordance with the finding. A motion for a new trial, in con-

nection with a proper assignment of error, presents the further question as to the sufficiency of the evidence. The first count of the affidavit and information was in the form prescribed by statute. Acts 1901, p. 475, §8, §7323c Burns 1901. It is contended, notwithstanding, that the charge is insufficient because of uncertainty.

In *Benham* v. *State,* 116 Ind. 112, which was a prosecution for a like offense, the charge was in the same general form, and it was held sufficient by this court. It was there said, at page 114: "We are of opinion, however, that the indictment in this case is not open to the objection that it does not state the offense charged with sufficient certainty. The offense charged against appellant herein is purely a statutory offense—that is, it was created and defined and its punishment prescribed by the provisions heretofore quoted of the above entitled act of April 11, 1885. In such a case, it has been held by this court, as a general rule, that an indictment or information will be sufficient to withstand a motion to quash, if it charge the offense in the language of the statute, or in terms substantially equivalent thereto. *Howard* v. *State,* 87 Ind. 68; *State* v. *Miller,* 98 Ind. 70; *Ritter* v. *State,* 111 Ind. 324; *Trout* v. *State,* 111 Ind. 499. In the case under consideration it is conceded on behalf of appellant that the offense charged is a statutory offense, and that the indictment charges him with such offense substantially in the language of the statute. In *Eastman* v. *State,* 109 Ind. 279, the appellant was prosecuted, as we may infer from the opinion of the court, as is the defendant in the case in hand, for unlawfully practicing medicine without having first procured, from the proper clerk, a license so to do. In the case cited the sufficiency of the charge seems to have been challenged, and, upon this point, the court there said: 'The offense is charged in the language of the statute, and this is sufficient. *State* v. *Miller,* 98 Ind. 70, and cases cited; *Graeter* v. *State,* 105 Ind. 271;

*Antle* v. *State,* 6 Tex. App. 202.'" Various acts may enter into the offense, but the acts, whether many or otherwise, constitute but one substantive offense, created by §1 of the act of 1897 (§7318 Burns 1901), namely, the offense of practicing medicine, surgery, or obstetrics without a license. As was said by this court in *Shilling* v. *State,* 5 Ind. 443: "Whenever the charge consists of a series of acts, they need not be specially described, because they are not the offense itself, but merely go to make up the evidence of the offense." It is proper to consider in addition the effect of the provision of the statute as to what shall be a sufficient charge. We cite as authorities bearing upon this question the following cases: *Riggs* v. *State,* 104 Ind. 261; *State* v. *Learned,* 47 Me. 426, 433; *State* v. *Corson,* 59 Me. 137; *Wolf* v. *State,* 19 Ohio St. 248; *Turpin* v. *State,* 19 Ohio St. 540; *Cathcart* v. *Commonwealth,* 37 Pa. St. 108; *Goersen* v. *Commonwealth,* 99 Pa. St. 388; *State* v. *Morgan,* 112 Mo. 202, 20 S. W. 456, and cases there cited. As there was no relaxing of the requirement that the ultimate substantive offense should be stated, we think, especially in view of the above authorities, that there has been no denial of the right of appellant to demand the nature and cause of the accusation against him.

It appears from the evidence that at the time in question the appellant practiced magnetic healing, and had done so for eight years prior thereto; that he did not use medicines or surgery; that he held himself out as a magnetic healer, advertised as such, and styled himself "Professor;" that he was not a graduate of any school of medicine, and had no license; that he diagnosed cases entirely by the nerves; that on the 8th day of April, 1901, one Edward Garvey came to him to be treated for a lame ankle; that after examining the ankle appellant diagnosed the case as rheumatism, and proceeded to give treatment, which consisted, at least in so far as there was anything manual about it, in holding the afflicted parts and rubbing them. An

Parks *v.* State.

effort upon the part of appellant, while testifying as a witness, to describe magnetic healing was prefaced by the statement that "it is pretty hard to describe for people to understand." At this point he was interrupted by the court, and the subject does not seem to have been pursued further. Appellant charged and received $1 for the treatment that he gave said Garvey. There can be no question as to appellant's guilt, if the act under which he was convicted is valid.

Assuming, for the time being, the validity of the statute, we do not think that any question is presented as to the sufficiency of the second and third counts of the affidavit and information. The rule of the criminal law is that when there is a good count and a bad count, and a general verdict of guilty is returned on which judgment is rendered, it will be presumed on appeal that the judgment was rendered on the good count. *Powers* v. *State,* 87 Ind. 97. It is true that the finding affirmatively appears to have been based on each count, but in a case of this kind, where there is one sufficient count,—assuming the validity of the statute,—and that count is established by evidence of a single, substantive transaction, admitted by the appellant, we think that questions as to the sufficiency of other counts of the affidavit and information are moot questions.

The prosecution in this case is based on the act of March 8, 1897 (Acts 1897, p. 255), and its subsequent amendments. §§7318-7323e Burns 1901. Certain sections of the act of 1897 were amended by an act passed in 1899. Acts 1899, p. 247. By an act passed in 1901, §8 of the original act was amended and certain sections of said amended act of 1897 were in turn amended. Acts 1901, p. 475. The act as it now stands is too long to set out here. It will reasonably suffice to set out that portion of §8 of the act, as amended in 1901, that precedes the provision as to what a charge of violating the act shall contain. Said first portion of the section referred to is as follows: "To open an office for such purpose or to announce to the public in

any way, a readiness to practice medicine ·in any county of the State, or to prescribe for, or to give surgical assist-ance to, or to heal, cure or relieve, or to attempt to heal, cure or relieve those suffering from injury or deformity, or disease of mind or body, or to advertise, or to announce to the public in any manner a readiness or ability to heal, cure or relieve those who may be suffering from injury or deformity, or disease of mind or body, shall be to engage in the practice of medicine within the meaning of this act: Provided, that nothing in this act shall be construed to apply to or limit in any manner the manufacture, advertisement or sale of proprietary medicines. It shall also be regarded as practicing medicine within the meaning of this act, if any one shall use in connection with his or her name the words or letters, 'Dr.,' 'Doctor,' 'Professor,' 'M. D.,' or 'Healer,' or any other title, word, letter, or designation intending to imply or designate him or her as a practitioner of medicine or surgery in any of its branches: Provided, that this act shall not be construed to apply to non-itiner-ant·opticians who are at this time engaged in, or who may thereafter engage in the practice of optometry in this State, nor to professional or other nurses."

The act of 1897, as amended in 1899, and as further amended in 1901, must be construed as though the amendments as they now exist had been incorporated in the original statute. *Blakemore* v. *Dolan,* 50 Ind. 194; *Pomeroy* v. *Beach,* 149 Ind. 511.

The appellant challenges the validity of the amended statute as applied to him. This challenge is based largely on the claim that the amended statute is in conflict with the fourteenth amendment to the federal Constitution. That amendment is as follows: "All persons born or natur-alized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of

citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The privileges and immunities clause of this amendment has no application to the denial that is complained of here. *Slaughter-House Cases,* 16 Wall. 36, 21 L. Ed. 394; *Duncan* v. *Missouri,* 152 U. S. 377, 14 Sup. Ct. 570, 38 L. Ed. 485; Cooley's Const. Lim. (5th ed.), 397.

But the last two clauses of the amendment challenge our attention. These are plain restrictions upon the exercise of arbitrary and capricious power over persons and property, when exercised by the state through any of its agencies. *Ex parte Virginia,* 100 U. S. 339, 25 L. Ed. 676; *Yick Wo* v. *Hopkins,* 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; *Dent* v. *West Virginia,* 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623; *Holden* v. *Hardy,* 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780. This amendment greatly expanded the power of the federal courts over state legislation, and conferred a like power upon the courts of the state, except in instances where like restraints were already embodied in the constitutions of the states. As to the provision concerning due process of law, it was said by the Supreme Court of the United States, in *Holden* v. *Hardy,* supra, at page 389: "This court has never attempted to define with precision the words 'due process of law,' nor is it necessary to do so in this case. It is sufficient to say that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard, as that no man shall be condemned in his person or property without due notice and an opportunity of being heard in his defense." In *Dent* v. *West Virginia,* supra, at page 124, it was said by Mr. Justice Field, in pronouncing the opinion of the court: "The great purpose of the requirement is to exclude everything that is arbitrary and capricious in legislation affect-

ing the rights of the citizen. As said by this court in *Yick Wo* v. *Hopkins,* speaking by Mr. Justice Matthews: 'When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.' 118 U. S. 356, 369. See, also, *Pennoyer* v. *Neff,* 95 U. S. 714, 733; *Davidson* v. *New Orleans,* 96 U. S. 97, 104, 107; *Hurtado* v. *California,* 110 U. S. 516; *Missouri Pac. R. Co.* v. *Humes,* 115 U. S. 512, 519."

The right to contract, as a means of acquiring property, is put on the same footing as the right to property. *Holden* v. *Hardy, supra; Dent* v. *West Virginia, supra.* In the case last cited it was said, at page 121: "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and can not be arbitrarily taken from them, any more than their real or personal property can be thus taken."

It was not, however, the effect of the last two clauses of the fourteenth amendment to emasculate the just powers of the states. The authority of the state remains so to control the conduct of individuals by reasonable laws as to protect the welfare of the community. As said by Judge Cooley: "Any accurate statement of the theory upon which the police power rests will render it apparent that a proper

exercise of it by the state can not come in conflict with the provisions of the Constitution of the United States. If the power extends only to a just regulation of rights, with a view to the due protection and enjoyment of all, and does not deprive any one of that which is justly and properly his own, it is obvious that its possession by the state, and its exercise for the regulation of the property and actions of its citizens, can not well constitute an invasion of national jurisdiction, or afford a basis for an appeal to the protection of the national authorities." Cooley's Const. Lim. (6th ed.), 707. See, also, *Barbier* v. *Connolly,* 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; *Minneapolis, etc., R. Co.* v. *Beckwith,* 129 U. S. 26, 9 Sup. Ct. 207, 32 L. Ed. 585; *Holden* v. *Hardy,* 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780.

The most extensive and pervading power existing in the states, by virtue of their general sovereignty, is the police power. "By the public police and economy," said Sir William Blackstone, in his commentaries on the laws of England, "I mean the due regulation and domestic order of the kingdom, whereby the individuals of the state, like the members of a well-governed family, are bound to conform their general behaviour to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations." 4 Blackstone's Com. (Wend.), 162. "This power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property." *Slaughter-House Cases,* 16 Wall. 36, 62, 21 L. Ed. 394. There are doubtless some rights of a purely personal and private character that their possessor does not surrender to the whole people by becoming a member of organized society. *Munn* v. *Illinois,* 94 U. S. 113, 124, 24 L. Ed. 77. But it

is evident that he must concede to society, in return for the enjoyment of its privileges, a large measure of authority over his conduct and possessions, and that in the process of development from a rude state of society to a complex civilization the zone of personal and private rights that are beyond legislative control must constantly diminish. *Holden* v. *Hardy, supra.* The maxim, *sic utere tuo ut alienum non laedas:* so use your own that another you may not injure, is the source of the police power, and furnishes the implied condition upon which every member of society possesses and enjoys his property. *Munn* v. *Illinois, supra; Orient Ins. Co.* v. *Daggs,* 172 U. S. 557, 566, 19 Sup. Ct. 281, 43 L. Ed. 552.

Under the law of eminent domain, the owner of property is entitled to compensation when his property is actually taken, and while the distinction between the exercise of this power and that of the police power may sometimes be difficult to perceive in practice, yet in their leading theories they are broadly differentiated, by reason of the fact that if the imposition of the burden or the control of the privilege can be affirmed as an act done within the scope of the police power, under existing laws, then there is no right of compensation. To that extent must the individual right be subordinated to the public weal. Under this power various burdens are imposed: Criminals are deprived of their liberty; the implements of crime are destroyed; vice and pauperism are controlled; noxious trades are regulated; nuisances are suppressed; children are required to attend school; the property of infants and persons *non compos* is placed in the control of others; the construction of buildings in populous neighborhoods is regulated; provision is made for the greater safety of passengers upon railways and steamboats; employers are required to provide safe places in which the work of their employes is to be performed; the hours of work, in employments deleterious to the health, limited; the employment of children in factories

prohibited; pure food laws are enacted; physicians, dentists, and druggists are licensed; and so the list might be almost indefinitely expanded by specific instances of authorized legislative regulations, enforcing the social compact, for the protection of life, health, morals, property, and the general weal of the community, until we perceive that definition is impossible and that the whole matter of the legislative element of sovereignty, as opposed to individual liberty, must, in the absence of other constitutional restriction, be left, as the federal Supreme Court has declared, to the gradual processes of judicial inclusion and exclusion, as the cases presented for decision require. *Davidson* v. *New Orleans,* 96 U. S. 97, 24 L. Ed. 616; *Holden* v. *Hardy,* 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780.

For hundreds of years the matter of the conservation of the public health has been a leading matter of police control. If a man holds himself out to the community as a person skilled in the science of healing and on that ground seeks the opportunity to exercise the skill he claims to possess, his business becomes impressed with a public character, and he is therefore subject to reasonable regulation in its prosecution.

This court upheld the medical law as it stood in the year 1897, in *State, ex rel.,* v. *Webster,* 150 Ind. 607, 41 L. R. A. 212, and the authority of a state, in the exercise of its police power, to pass a reasonable law upon that subject was affirmed by the United States Supreme Court in *Dent* v. *West Virginia,* 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623. Upon the authority of these cases, and the many cases decided by the courts of other states, and cited in the case of *State, ex rel.,* v. *Webster, supra,* we might perhaps without discussion have decided most of the questions involved in this case, but as the statutes upon which the judgments in those cases rest are different from the statute here under consideration, and as the appellant assails said act as an unwarranted invasion of his pursuit of a business

that he claims is at least harmless, it has seemed to us proper to consider, to some extent, the authority of the state to control him in the exercise of such pursuit.

In *Dent* v. *West Virginia, supra,* at page 122, it was said: "Few professions require more careful preparation by one who seeks to enter it than that of medicine. It has to deal with all those subtle and mysterious influences upon which health and life depend, and requires not only a knowledge of the properties of vegetable and mineral substances, but of the human body in all its complicated parts, and their relation to each other, as well as their influence upon the mind. The physician must be able to detect readily the presence of disease, and prescribe appropriate remedies for its removal. Every one may have occasion to consult him, but comparatively few can judge of the qualifications of learning and skill which he possesses. Reliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he possesses the requsite qualifications."

Counsel for appellant denounce the law in question as "an attempt to determine a question of science, and control the personal conduct of the citizen without regard to his opinion, and in a matter in which the public is in no wise concerned." We think, on the contrary, that the matter is one of very considerable concern, and that the legislature is the appropriate tribunal to determine the degree of learning that those who gain a livelihood by seeking to relieve the bodily ailments of others should possess. While it is true that the often quoted definition of police power afforded by Chief Justice Shaw, in *Commonwealth* v. *Alger,* 7 Cush. 53, 85, contains the limitation that such laws must be wholesome and reasonable, yet it is evident, as the power to enact laws has been confided to the legislative department, that a very large measure of authority is vested in that department to determine what is reasonable and wholesome in the enactment of statutes under the police power.

Parks *v.* State.

The courts could never venture to run a race of opinion with the legislature upon questions of mere expediency; such a course would be a gross judicial usurpation of power.

Appellant's counsel particularly objects to the classification that the statute provides for, on the ground that it is unjust and arbitrary. In the exercise of the police power there must needs be a considerable discretion vested in the legislature, whereby some people have rights or suffer burdens that others do not. Nevertheless, if the objection mentioned has any real basis, the statute must be condemned by the courts. As said in *Barbier* v. *Connolly,* 113 U. S. 27, 31, 5 Sup. Ct. 357, 28 L. Ed. 923: "The fourteenth amendment, in declaring that no state 'shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all, under like circumstances, in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one, except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses."

The statute of a state that deprives any person of his life, liberty, or property without due process of law, or that denies to any person within the jurisdiction of the state the equal protection of the laws, can not be upheld on the theory

that it is an exercise of the power of classification. *Connolly v. Union Sewer Pipe Co.,* 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679. It is undoubtedly true, as stated by Judge Cooley, that a proper exercise of the police power can not come in conflict with the national jurisdiction, but, after all, the ultimate test of propriety must be found in the limitations of the fourteenth amendment, since it operates to hedge in the field of the police power to the extent of preventing the enforcement of statutes in denial of the rights that the amendment protects. Especially in cases where statutes are enacted that deny to persons the right to follow their accustomed vocations in life, while the same right is granted to others, are the courts insistent that there must be some substantial basis in reason and justice for the discrimination. The Connolly case above cited is the latest expression of the United States Supreme Court upon this general subject. In that case what is popularly termed an antitrust act, denying to offending corporations the right to enforce their contracts by suit, was condemned because of a section thereof that provided that the provisions of the act should not apply to agricultural products or live stock while in the hands of the producer or raiser. In disposing of the question the court, at page 563, said: "It is one thing to exert the power of taxation so as to meet the expenses of government, and at the same time, indirectly, to build up or protect particular interests or industries. It is quite a different thing for the state, under its general police power, to enter the domain of trade or commerce, and discriminate against some by declaring that particular classes within its jurisdiction shall be exempt from the operation of a general statute making it criminal to do certain things connected with domestic trade or commerce."

Of course the point decided in the above case is only illustrative of the proposition that enactments within the domain of the police power may be obnoxious to the federal Constitution by reason of an arbitrary exercise of the power

Parks v. State.

of ·classification.   The power of reasonable classification, however, exists *(Missouri* v. *Lewis,* 101 U. S. 22, 31, 25 L. Ed. 989; *Barbier* v. *Connolly,* 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; *Hayes* v. *Missouri,* 120 U. S. 68, 71, 7 Sup. Ct. 350, 30 L. Ed. 578), and in cases where there is room for the presumption that a substantial and just reason furnished the basis for legislation enacted in the carrying out of a public purpose, the exercise of the legislative discretion, in the establishing of a classification, must be respected by the courts.   *Holden* v. *Hardy,* 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780.

We do not think that there is involved in this case a question as to the authority of the legislature to discriminate against a particular school of practitioners.   We are not judicially advised that magnetic healing, so called, is so far based on coördinated, arranged, and systematized knowledge that it can be termed a science, or that any considerable degree of instruction is a prerequisite to its prosecution, as it is actually practiced by those whose knowledge does not go beyond the manifestation of the phenomena of magnetism. It may have been the judgment of the legislature, in its implied exclusion of appellant, that both the limitations of value that the treatment possessed and the dangers attending it made it wise to confine its use to a body of men in whose hands it would be safer to entrust it, because of their education in subjects relevant to its administration.

The legislature, in judging of a matter of this kind, was authorized to give heed to the opinions of scientific men, and, presuming that it did so, it doubtless found substantial reason for the act of exclusion complained of.   Judged by such authority, it appears that while the practice of magnetic healing is based on some elements of ascertained knowledge, yet that its prosecution is attended with danger to such a degree that the legislature was justified in its effort to take it out of the hands of empirics.   Thus, J. G.

M'Kendrick, professor of the institutes of medicine, University of Glasgow, in concluding his learned article on Animal Magnetism, in the Encyclopaedia Britannica, says: "It is evident then that animal magnetism or hypnotism is a peculiar physiological condition excited by perverted action of certain parts of the cerebral nervous organs, and that it is not caused by any occult force emanating from the operator. Whilst all the phenomena can not be accounted for, owing to the imperfect knowledge we possess of the functions of the brain and cord, enough has been stated to show that just in proportion as our knowledge has increased has it been possible to give a rational explanation of the phenomena. It is also clear that the perverted condition of the nervous apparatus in hypnotism is of a serious character, and therefore that these experiments should not be performed by ignorant empirics for the sake of gain, or with a view of causing amusement. Nervous persons may be seriously injured by being subjected to such experiments, more especially if they undergo them repeatedly; and it should be illegal to have public exhibitions of the kind alluded to. The medical profession has always been rightly jealous of the employment of hypnotism in the treatment of disease, both from fear of the effects of such operations on the nervous systems of excitable people, and because such practice is in the border land of quackery and of imposture. Still, in the hands of skilful men, there is no reason why the proper employment of a method influencing the nervous system so powerfully as hypnotism should not be the means of relieving pain or of remedying disease."

As appellant was without the license provided for by statute, it may be presumed that he was engaged in empiricism, which is defined as a practice of medicine,—using that term in its popular sense,—founded on mere experience, without the aid of science or a knowledge of its principles. The State has by no means denied the right to seek to relieve persons afflicted with rheumatism by the process of manipu-

Parks *v.* State.

lating and kneading the diseased or affected parts, with or without the element of hypnotic suggestion, but the legislature has sought to deny to all persons the right to do the acts denominated by statute as "engaging in the practice of medicine" unless they possess the certificate required.

The statute in question, in its general scope, goes no further than to establish a standard that may be attained by reasonable application, and the means has an appropriate relation to the end. There is plainly, as applied to the case in hand, no arbitrary or unreasonable deprivation of right. In the language of the court in *Dent* v. *West Virginia*, 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623: "The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are unattainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation."

We will now proceed to consider the elements in the legislative scheme of classification of which complaint is particularly made. The amendment of 1899 provides that the law shall not apply "to any physician or surgeon who is legally qualified to practice in the state or territory in which he resides, when in actual consultation with a legal practitioner of this State, nor to any physician or surgeon residing on the border of a neighboring state and duly authorized to practice under the laws thereof, whose practice extends into the limits of this State. Provided, that such practitioner shall not open an office or appoint a place to meet patients or receive calls within the limits of this State." The people of the State ought not to be deprived of the opportunity to call in consultation with their own physicians and surgeons eminent and skilful physicians

and surgeons of other states, and considerations of convenience to the people doubtless prompted the establishing of the exception to the operation of the law in the case of physicians and surgeons residing on the borders of the State. Even the members of this class must be authorized to practice under the laws of the states in which they respectively live, where it may be fairly presumed that there are reasonable restrictions. Like provisions have been upheld by other courts. *France* v. *State,* 57 Ohio St. 1, 11, 47 N. E. 1041; *State* v. *Van Doran,* 109 N. C. 864, 14 S. E. 32; *Fox* v. *Territory,* 2 Wash. Ter. 297, 5 Pac. 603; *Commonwealth* v. *Wilson,* 19 Pa. Co. Ct. 521; *Commonwealth* v. *Finn,* 11 Pa. Super. 620; *Scholle* v. *State,* 90 Md. 729, 46 Atl. 326, 50 L. R. A. 411.

The lines of employment of the optician and that appellant was pursuing are so diverse as to raise no question as to the power of the legislature to discriminate between them. There is, in this instance, wanting the "like circumstances" necessary to raise any question of arbitrary discrimination. *Missouri* v. *Lewis,* 101 U. S. 22, 25 L. Ed. 989; *Barbier* v. *Connolly,* 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; *Hayes* v. *Missouri,* 120 U. S. 68, 7 Sup. Ct. 350, 30 L. Ed. 578.

The exception in favor of professional and other nurses might present a question of difficulty if appellant were only charged with an act that might be properly described as nursing, but he is impliedly charged under the first count with a violation of the statute in other particulars,—particularly in the manner in which he held himself out. As said by the supreme court of Illinois in *People* v. *Gordon,* 194 Ill. 560, 571, 62 N. E. 858: "We all agree that the objects and purposes of this and similar statutes are to protect the sick and suffering, and the community at large, against the ignorant and unlearned who hold themselves out as being possessed of peculiar skill in the treatment of disease; from holding themselves out to the world as phy-

sicians and surgeons without having acquired any knowledge whatever of the human system or the diseases and ailments to which it is subject. Without some knowledge of the location and offices of the various nerves, muscles, and joints, the manipulation of those parts and the flexing of the limbs can not be intelligently, if, indeed, safely, practised. Merely giving massage treatment or bathing a patient is very different from advertising one's business or calling to be that of a doctor or physician, and, as such, administering osteopathic treatment. The one properly falls within the profession of a trained nurse, while the other does not."

Appellant's counsel further objects to a classification that excludes appellant from following his business, while it permits the granting of licenses to practice osteopathy. Osteopathy is defined by the Annual Encyclopaedia for 1900, page 554, as "A method of treating diseases of the human body without the use of drugs, by means of manipulations applied to various nerve centers, chiefly those along the spine, with a view to inducing free circulation of the blood and lymph, and an equal distribution of the nerve forces. Special attention is given to the readjustment of any bones, muscles, or ligaments not in the normal position." The encyclopaedia names some seven osteopathic colleges, and states that the prescribed course of study covers a period of four terms, of five months each, and that the curriculum includes, in addition to the theory of clinical demonstration of osteopathy, demonstrative and descriptive anatomy, histology, chemistry, physiology, hygiene, pathology, physiological psychology, dietetics, obstetrics, and minor surgery. The classification under consideration seems to be based on mental competency, and is far from arbitrary. We think, therefore, that this objection is without merit.

Appellant's counsel further contends that the section of the statute of 1901 that we have quoted is invalid for the want of a sufficient title. Section 19 of article 4 of the

Indiana Constitution ordains that "Every act shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title." As the acts of 1899 and 1901 both purport to be amendatory of the act of 1897, it is proper to determine the question raised by considering whether if §8 had been a part of the original act it would have been sufficiently entitled. The title of the last mentioned act reads as follows: "An act regulating the practice of medicine, surgery and obstetrics, providing for the issuance of a license to practice, providing for the appointment of a state board of medical registration and examination and defining their duties, defining certain misdemeanors and providing penalties, and repealing all laws in conflict therewith and certain acts therein specified."

It is not required that the title to an act should be an epitome of the act. It is the "subject" of the act, and not the "matters properly connected therewith," that the Constitution requires to be "expressed in the title." As stated by Fraser, J., in *Hingle* v. *State,* 24 Ind. 28, 32: "The mischiefs intended to be prevented by the section were two: First, the passage of any act under a false and delusive title, which did not indicate the subject-matter contained in the act,—a trick by which members of the legislature had been deceived into the support of measures in ignorance of their true character. Second, the combining together in one act of two or more subjects, having no relation to each other, —a method by which members, in order to procure such legislation as they wished, were often constrained to support and pass other measures obnoxious to them, and possessing no intrinsic merit." The subject of the act in question may be said to be a regulation of the practice of medicine, surgery, and obstetrics. Is this subject sufficiently definite to authorize the enactment in question? It seems to us that the matters mentioned in said amendatory section are, at least, for the most part, matters properly connected with the subject stated. It was certainly competent for the legis-

lature to submit in connection therewith a fairly relevant definition of the "practice of medicine." We are not called upon to determine whether all of the acts mentioned in said section can properly be denominated as practicing medicine.

It is only necessary to determine whether the appellant has brought himself within the statutory definition of the practice of medicine, in so far as the acts therein mentioned can be said, in a substantial sense, to amount to practicing medicine. The term "practice of medicine" is, at least in its popular sense, generic in its character. *People* v. *Blue Mountain Joe,* 129 Ill. 370, 21 N. E. 923; *People* v. *Gordon,* 194 Ill. 560, 62 N. E. 858; *Little* v. *State,* 60 Neb. 749, 753, 84 N. W. 248, 51 L. R. A. 717; *State, ex rel.,* v. *Lee* (La. Sup.), 31 South. 14. This court has announced that it is its disposition, in the enforcement of the constitutional mandate under consideration, not to embarrass the legislature by unnecessary strictness in the enforcement of the requirement. *State.*v. *Gerhardt,* 145 Ind. 439, 33 L. R. A. 313, and cases there cited. In the case of *In re Campbell,* 197 Pa. St. 581, 588, 47 Atl. 860, it was said: "The purpose of the act is indicated in the phrase 'to regulate the practice of medicine and surgery.' This gives notice to any one desiring to enter the practice, that its provisions do or may concern him. Nothing more is required."

It is our conclusion that appellant was engaged in the practice of medicine, since he held himself out as a magnetic healer, and his method of treatment was, at least in part, the method that medical practitioners sometimes employ.

If it was competent for the legislature to·have enacted the amendment of 1901 as a part of the act of 1897, it is immaterial whether the acts on which appellant's conviction was based were or were not a violation of law in the interim. As the act of 1901 is now a part of the law of 1897, it follows that appellant was properly convicted.

We find no available error. The judgment is affirmed.