373 So.2d 988 (1979)
Sadie Carmouche GRAHAM, Administrator of the Estate of Walter C. Carmouche, Plaintiff-Appellee,
v.
EQUITY NATIONAL LIFE INSURANCE COMPANY, Defendant-Appellant.
No. 7077.
Court of Appeal of Louisiana, Third Circuit.
July 25, 1979.
Writ Refused October 8, 1979.
*989 Bolen & Erwin, Greg S. Erwin, Alexandria, for defendant-appellant.
John T. Bennett, of Riddle & Bennett, Marksville, for plaintiff-appellee.
Before DOMENGEAUX, GUIDRY and CUTRER, JJ.
GUIDRY, Judge.
Plaintiff[1] instituted suit to recover hospital and medical benefits allegedly due under an insurance policy issued by defendant, Equity National Life Insurance Company (Equity), along with penalties and attorney's fees under LSA-R.S. 22:657.[2] The *990 policy is entitled a "Cancer Only Supplemental Policy" which provides reimbursement for certain hospital and medical costs resulting from the treatment of cancer as defined in the policy. The insured, Walter Carmouche, died on February 12, 1977, while the policy was in full force and effect. The death certificate showed the cause of the insured's death to have been carcinoma of the lung. As medical and hospital expenses had been incurred prior to the insured's death, a loss claim was filed against Equity. Equity refused to pay any benefits under the policy contending that the claimant had failed to furnish adequate proof that the cause of the insured's death was cancer as defined in the policy. That portion of the policy giving rise to the dispute between the parties provides:

"PART 1 CANCER DEFINEDPOSITIVE PATHOLOGY REQUIRED
"A. Cancer is defined as a disease manifested by the presence of a malignant tumor characterized by the uncontrolled growth and spread of malignant cells, the invasion of tissue, or leukemia. Such cancer as above defined must be positively so diagnosed by a legally licensed doctor of medicine or osteopathy certified by the American Board of Pathology or the Osteopathic Board of Pathology to practice Pathologic Anatomy, upon the basis of a mis-(sic) croscopic examination of fixed tissue or preparation from the hemic system (either during life or post-mortem). The pathologist establishing the diagnosis shall base his judgment solely on the criteria of malignancy as accepted by the American Board of Pathology or the Osteopathic Board of Pathology after a study of the histocytologic architecture or pattern of the suspect tumor, tissue or specimen. Clinical diagnosis does not meet this standard."
It is undisputed that although four medical doctors clinically diagnosed the insured's condition as carcinoma of the lung, no microscopic examination of fixed tissue was ever made, either prior to or following the insured's death, and that Equity refused to process the beneficiary's claim unless and until it was provided with such pathological evidence. It is Equity's position that under the terms of the policy the duty of supplying such proof was on the claimant and not on Equity. Plaintiff contends that there was no such duty on her part; that if Equity wanted pathological evidence of cancer, in spite of the numerous clinical diagnoses, it should have performed an autopsy; and, that in any event the terms of the policy are ambiguous and should be strictly construed against the insurer.
The trial court rendered judgment in favor of plaintiff, finding that the above quoted provision was ambiguous, stating:

"Apparently, defense counsel interprets the above to mean that whether it is a doctor of medicine or osteopathy, the diagnosis must be on the basis specified in the latter part of the above quoted paragraph. The court disagrees with this interpretation grammatically. The word `or' is disjunctive here. If the latter part of the paragraph applied to the licensed doctor of medicine the paragraph should continue with the words `and' after medicine, instead of `or.' *991 The court believes and holds that the latter part of the paragraph, grammatically, refers to the doctors of Osteopathy. And, there is a good reason for this. Doctors of Osteopathy are not always nor necessarily doctors of medicine. We quote, here, from Black's Law Dictionary:

`OSTEOPATHY. A method or system of treating various diseases of the human body without the use of drugs, by manipulation applied to various nerve centers, rubbing, pulling, and kneading parts of the body, flexing and manipulating the limbs, and the mechanical readjustment of any bones, muscles, or ligaments not in the normal position, with a view to removing the cause of the disorder and aiding the restorative force of nature in cases where the trouble originated in misplacement of parts, irregular nerve action, or defective circulation. State v. Liffring, 61 Ohio St. 39, 55 N.E. 168, 76 Am.St.Rep. 358; Parks v. State, 159 Ind. 211, 64 N.E. 862, 58 L.R.A. 190.

`A system of treatment based on the theory that diseases are chiefly due to deranged mechanism of the bones, nerves, blood vessels, and other tissues, and can be remedied by manipulations of these parts. Special attention is given to the readjustment of any bones, muscles, or ligaments not in the normal position. Waldo v. Poe, D.C.Wash., 14 F.2d 749, 751; Arnold v. Schmidt, 155 Wis. 55, 143 N.W. 1055, 1058; State ex rel. Wheat v. Moore, 154 Kan. 193, 117 P.2d 598, 602. The term does not include the practice of optometry. Ex parte Rust, 181 Cal. 73, 183 P. 548, 550, nor, at least under some statutes, the practice of medicine or surgery. State v. Sawyer, 36 Idaho 814, 214 P. 222.'

Here, the diagnosis of the several medical doctors is that the insured died of lung cancer. They do not have to be pathologists in the court's view and opinion. And licensed doctors of medicine can make the diagnosis on the basis of his expertise in medicine, if he is licensed to practice as such; the latter provisions of the policy, above quoted, apply to the analysis of cancer by osteopaths.

The court believes and holds, that there is abundant proof in the record by four medical doctors, duly licensed as such, that the insured's death was caused by cancer of his lung. Therefore, his widow is entitled to recover the benefits payable under the policy ..."
The trial court further determined that insofar as Equity had no legal reason for denying the plaintiff's claim, it was liable for penalties in the sum of $3,216.00 and $2,000.00 in attorney's fees under LSA-R.S. 22:657 along with the principal sum due under the policy of $1,608.00. Equity perfected this appeal, urging several specifications of error. The issues on appeal are:
1. DID THE POLICY OF INSURANCE PLACE A DUTY UPON PLAINTIFF TO PROVIDE EQUITY WITH PATHOLOGICAL EVIDENCE THAT THE INSURED WAS SUFFERING FROM CANCER?
2. IS PLAINTIFF ENTITLED TO PENALTIES AND ATTORNEY'S FEES UNDER LSA-R.S. 22:657?
1. WAS IT PLAINTIFF'S DUTY UNDER THE POLICY TO SUPPLY EQUITY WITH PATHOLOGICAL EVIDENCE OF THE INSURED'S CONDITION?
The trial court concluded that the requirement in Part 1A of the policy for pathological evidence in support of a cancer diagnosis applied only to Doctors of Osteopathy. We find such a conclusion to be manifestly in error.
An insurance policy is a contract between the parties, and while all ambiguities must be construed in favor of the insured and against the insurer, courts have no authority to change or alter its terms under the guise of interpretation when these terms are couched in clear and unambiguous language. Edwards v. Life & Casualty Ins. Co., 210 La. 1024, 29 So.2d 50 (1946); Clerk v. Connecticut Fire Ins. Co., 203 So.2d 866 (La.App. 2d Cir. 1967), writs refused 251 La. 733, 206 So.2d 90; Ory v. Louisiana & Southern Life Ins. Co., 352 So.2d 308 (La. App. 4th Cir. 1977).
*992 We find that insofar as the policy precludes clinically diagnosed cases of cancer (without supporting pathological evidence) from the insurer's definition of cancer in all cases, the terms of the policy are clear and unambiguous. Regardless of whether the diagnosing physician is a medical doctor or a Doctor of Osteopathy the policy clearly requires pathological substantiation of ALL clinical diagnoses as a prerequisite to recovery under the policy. The medical testimony in the record further supports this conclusion. Dr. White, an otolaryngologist who had examined the insured prior to his death, testified in deposition that the only positive way to diagnose lung cancer is by an examination of a fixed tissue sample (a pathological examination), either while the patient is living or post mortem. Dr. White further testified that cancer may sometimes "mimic" other diseases from a symptomatic standpoint, and that lung cancer is sometimes particularly difficult to diagnose. In light of the peculiar nature of the disease, it is apparent that Equity intended to pay benefits only in the event the insured was positively diagnosed as having cancer.
Determining that the policy unambiguously requires pathological evidence in all cases before benefits are payable does not, however, address the question of who bears the burden of producing such evidence. On this issue, we do not find appellant's position, i. e., that it was the claimant's duty to provide and furnish Equity with the pathological evidence, to be clearly and unequivocally supported by the terms of its policy. The policy simply defines cancer as requiring a pathological examination, it does not expressly place the burden of producing such proof upon the claimant. Part 1(C) of the policy provides:

"EXCEPTIONS AND LIMITATIONS

C. This policy pays only for loss resulting from definitive cancer treatment, including only direct extension, metastatic spread (and/or its direct effects) or recurrence (and pathologic proof thereof shall be submitted to support such additional claims as provided under the terms of the policy). This policy does not cover any disease or sickness or incapacity other than that resulting directly from cancer." (Emphasis added)

There is no dispute that Walter Carmouche was not suffering from a "recurrence" of cancer, such as would place him within the express rule requiring the submission of pathological evidence in support of "additional claims". However, the above quoted provision is the only express provision in the policy addressing the submission of specific evidence by the claimant in support of a loss claim. Therefore we do find ambiguity in the policy insofar as determining who has the duty of producing the necessary pathological proof of cancer when the condition is not the result of a recurrence. It would have been a simple matter for Equity to have expressly provided that all claimants would have to submit pathological evidence as part of their loss claim, similar to the above quoted provision in Part 1(C). Their failure to do so gives rise to the ambiguity asserted by plaintiff.
It is well settled that any ambiguity in an insurance contract must be resolved against the insurer and in favor of the insured, and that when a policy admits of two interpretations the claim for the one sustaining indemnity will be adopted. Ory v. Louisiana & Southern Life Ins. Co., supra; Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (La.1958); Albritton v. Fireman's Fund Ins. Co., 224 La. 522, 70 So.2d 111 (La.1953). It is certainly reasonable to conclude, as did appellee, that if Equity could not process the claim without pathological evidence that the insured died of cancer (which they had the right to do under Part 1(A) of the policy), they would simply exercise their right to perform an autopsy on the deceased at the insurer's own expense as provided for in Part 4(10) of the policy.[3] *993 As the policy reasonably admits to such an interpretation, and as such interpretation supports the insured's claim for recovery, we adopt this construction and find that the policy places the burden of obtaining pathological evidence to support a loss claim upon the insurer and not upon the claimant.
We note, however, that even if we were to find that the policy clearly placed the above stated duty upon the claimant, a serious question regarding public policy would arise under the facts herein presented. It is undisputed that in January, 1977, when Walter Carmouche was first clinically diagnosed as having lung cancer, he was 81 years old and in a very advanced stage of the disease. His physicians determined that taking a fixed tissue sample for the purpose of positively diagnosing his condition was neither warranted, as the tumor was by that time inoperable, nor advisable, as it was believed that he would not survive the surgery. Equity has not disputed the propriety of this decision. Certainly there is no question that an insurance policy which required the taking of a tissue sample while the insured was alive, under such circumstances, would be clearly contrary to public policy and unenforceable. Likewise, to require the claimant to incur the doubtless high cost of securing a tissue sample and having it examined post mortem in order to confirm a loss claim on a policy with such limited coverage as the policy herein sued upon, raises serious questions of public policy. Particularly is this so in light of the fact that four physicians stated that they were certain the insured had lung cancer, and clinically diagnosed his condition to be such. Also, carcinoma of the lung was ultimately determined to be the cause of the insured's death.
In sum, we find that appellee was not bound to secure pathological evidence and submit such evidence to Equity as a prerequisite to the recovery of benefits under the policy. If Equity wanted such evidence, they could have and should have exercised their right to perform an autopsy on the insured. We therefore affirm the judgment of the trial court awarding plaintiff the amount of $1,608.00 in benefits under the policy.
2. IS PLAINTIFF ENTITLED TO PENALTIES AND ATTORNEY'S FEES UNDER LSA-R.S. 22:657?
The trial court determined that plaintiff was entitled to $3,216.00 in penalties and $2,000.00 for attorney's fees under LSA-R.S. 22:657. We find the trial court erred in making these awards.
LSA-R.S. 22:657 governs the award of penalties and attorneys' fees when insurers fail to make timely payment of loss claims under health and accident policies. However, in the case of Tabb v. La. Health Services & Indemnity Co., 361 So.2d 862 (La.1978) our Supreme Court determined that a Blue Cross policy which did not insure against injury, disablement or death, but provided benefits only for hospital and medical care was not a "Health and Accident" policy. The policy in the instant case likewise provides benefits only for hospital and medical care, and is therefore not a health and accident policy within the scope of LSA-R.S. 22:657.
LSA-R.S. 22:658, however, provides as follows:
"All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of *994 the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees."
In order to find penalties and attorney's fees properly awardable in the instant case, we would therefore have to find that Equity's failure to make timely payment of plaintiff's claim was arbitrary, capricious and without probable cause. The record reveals that Equity did not deny plaintiff's claim arbitrarily or without probable cause, and we find that plaintiff is not entitled to penalties or attorney's fees under LSA-R.S. 22:658.
We have ultimately determined that the policy sued upon did not clearly place upon the claimant the duty of providing Equity with pathological evidence of the existence of cancer in the insured, and that the policy in this respect is subject to more than one reasonable interpretation. However, we find that Equity acted reasonably in requesting to be provided with pathological evidence to support appellee's loss claim in this case. Equity's interpretation of its own policy provisions was not unreasonable. Under the terms of the policy, cancer is defined solely as a pathologically diagnosed disease. The evidence submitted by plaintiff did not therefore establish that any loss within the terms of the policy had occurred. The record reveals that Equity wrote to the physicians who had treated the insured prior to his death to obtain any test results they might have to support the clinical diagnoses in an attempt to process plaintiff's claim. Equity paid for and received the results of a bronchoscopy test performed by Dr. White, but such results were negative. The record further reveals that a left scalene node biopsy taken to determine the existence of lung cancer in the insured was likewise negative, as were the bronchial washings taken prior to the insured's death.
LSA-R.S. 22:658 is a penal statute and must, therefore be strictly construed. One who claims penalties and attorney's fees under this statute has the burden of proving submission to the defendant of "satisfactory proof of loss" as a necessary predicate to a showing that the defendant was arbitrary, capricious and without probable cause in failing to pay benefits. Gatte v. Coal Operators Casualty Company, 225 So.2d 256 (La.App. 3rd Cir. 1969); Halford v. Republic Underwriters Ins. Co., 348 So.2d 87 (La.App. 4th Cir. 1977), writs refused, October 26, 1977.
The policy expressly provides that clinically diagnosed cases of cancer did not fall within the insurer's definition of cancer. Equity reasonably believed that it was the duty of the claimant to provide it with sufficient proof of a loss within such terms. Plaintiff would not send Equity pathological proof of cancer, and the test results received by Equity apparently conflicted with the clinical diagnoses. Where an insurer's interpretation of its policy is reasonable, the denial of a claim is not arbitrary so as to require the imposition of penalties and the insurer has a right to a judicial determination of the issue. Cotlar v. Gulf Insurance Company, 318 So.2d 923 (La.App. 4th Cir. 1975); Halford v. Republic Underwriters Ins. Co., supra. See also the recent decision of our Supreme Court in Carney v. American Fire & Indemnity Company, 371 So.2d 815 (La.1979).
We find that a bona fide dispute existed between the litigants, and that Equity's action in refusing plaintiff's claim was not made arbitrarily, but reasonably and in good faith. While we disagree with the interpretation appellant placed upon the policy, we find that its actions in this case should not subject it to the penalty provisions of LSA-R.S. 22:658. See also Cotlar v. Gulf Insurance Company, supra. Accordingly, *995 we find that the trial court erred in awarding penalties and attorney's fees to plaintiff.
For the above and foregoing reasons, the judgment of the trial court is reversed insofar as it awards penalties and attorney's fees to plaintiff. In all other respects the lower court judgment is affirmed. All costs of this appeal are to be borne by appellant.
AFFIRMED IN PART AND REVERSED IN PART.
DOMENGEAUX, J., concurs in the results and assigns written reasons.
DOMENGEAUX, Judge, concurring in the results.
Within the factual context of this case, Part 1 of the insurance policy is violative of public policy. It is on that basis that I would affirm the trial court's award of medical benefits. I feel that the treatment of the public policy question in the principal opinion is correct.
I also think that the denial of penalties and attorney's fees in this case is correct; however, I disagree with the reasons set forth for such denial in the principal opinion. Instead of finding Equity's actions reasonable by misinterpreting an ambiguous policy provision, as is done in the principal opinion, I feel that Equity was reasonable because there existed a genuine factual dispute concerning the insured's disease. As stated in the principal opinion, defendant, in an attempt to process plaintiff's claim, wrote to the physicians who had treated the insured prior to his death in order to obtain any test results which they might have had to support the clinical diagnoses. It paid for and received the results of a bronchoscopy test performed by Doctor White, but such results were negative. The record further reveals that a left scalene node biopsy, taken in order to determine the existence of lung cancer in the insured, was likewise negative, as were the bronchial washings taken prior to the insured's death.
I think that, in view of the presence of negative test results, there existed a reasonable factual dispute concerning the insured's disease. Consequently, I conclude that the totality of the circumstances present within the limited factual setting of this case warrants the conclusion that defendant did not act arbitrarily in denying benefits. See my dissent in Paret v. Louisiana Health Service & Indemnity Company, 366 So.2d 634 (La.App. 3rd Cir. 1978), writ denied 369 So.2d 139 (La.1979).
Therefore, I respectfully concur.
NOTES
[1] Suit was originally brought by Sadie Carmouche Graham as administratrix of the insured's estate. An amending petition was subsequently filed making Alice Carmouche the party plaintiff as beneficiary under the policy sued upon.
[2] LSA-R.S. 22:657 provides:

"A. All claims arising under the terms of health and accident contracts issued in this state, except as provided in Subsection B, shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent business man on his guard, exist. The insurer shall make payment at least every thirty days to the assured during that part of the period of his disability covered by the policy or contract of insurance during which the insured is entitled to such payments. Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court. The district court of the parish where the insured lives or has his domicile shall have jurisdiction to try such cases.
B. All claims for accidental death arising under the terms of health and accident contracts where such contracts insure against accidental death shall be settled by the insurer within sixty days of receipt of due proof of death and should the insurer fail to do so without just cause, then the amount due shall bear interest at the rate of six percent per annum from date of receipt of due proof of death by the insurer until paid."
[3] Part 4(10) provides:

"PHYSICAL EXAMINATIONS AND AUTOPSIES: The Company at its own expense shall have the right and opportunity to examine the person of the insured when and as often as it may reasonably require during the pendency of a claim hereunder and to make an autopsy in case of death, where it is not forbidden by law."