O'Neil v. State.

## H. G. O'NEIL *v.* STATE.

### (*Knoxville.*   September Term, 1905.)

1. **STATUTE.** Words to be taken in their natural and ordinary sense, when.

    As a general rule, the words of a statute, if of common use, are to be taken in their natural and ordinary sense, and without any forced or subtle construction to extend their meaning. (*Post, p.* 436.)

    Case cited and approved: State, ex rel., v. Turnpike Co., 2 Sneed, 90.

2. **PHYSICIANS.** One diagnosing diseases by microscopic examination of blood, and treating patients with electric arc lights, is not an optician, when.

    One who makes microscopic examinations of the blood taken from his patients in his diagnoses of their disease, and treats them by placing them under the rays of electric arc lights of a certain kind, and also writes prescriptions and prescribes remedies, though no charge is made for prescriptions, is not an optician, within the sense of the statute (Acts 1901, ch. 78) excepting opticians from its provisions requiring license to practice medicine.   (*Post, pp.* 429-437.)

    Acts cited and construed: 1901, ch. 78, secs. 1, 18, and 19.

3. **SAME.** Same. One is engaged in the practice of medicine in the sense of the statute prohibiting the same without a license, when.

    One who makes microscopic examinations of the blood taken from his patients in his diagnoses of their diseases, and treats them by placing them under the rays of electric arc lights of a certain kind, and also writes prescriptions and prescribes remedies, though no charge is made for prescriptions, is engaged in the practice of medicine, within the sense of the

statute (Acts 1901, ch. 78), prohibiting the practice of medi-
cine without a prescribed license, and providing that any per-
son shall be regarded as practicing medicine who shall treat,
or profess to treat, operate on, or prescribe for any physical
ailment of another. (*Post, pp.* 432, 437-441.)

Acts cited and construed: 1901, ch. 78, secs. 1, 18, and 19.

Cases cited and approved: Payne v. State, 112 Tenn., 588; Bib-
ber v. Simpson, 59 Me., 181; People v. Phippin, 70 Mich., 6;
Parks v. State, 159 Ind., 211; State v. Van Doran, 109 N. C.,
867.

4. **SAME. Same. Same. Statute requiring a prescribed license,**
**for the practice of medicine is constitutional and valid.**
The statute prohibiting the practice of medicine without a pre-
scribed license, and defining what is the practice of medicine
within the meaning of the statute, is constitutional and valid.
(*Post, pp.* 429, 441-443.)

Acts cited and construed: 1901, ch. 78.

Cases cited and approved: State v. Heath, 125 Iowa, 585; Slaugh-
ter House Cases, 16 Wall., 36; Virginia, Ex parte, 100 U. S.,
339; Holden v. Hardie, 169 U. S., 366; State v. Edmunds (Iowa),
101 N. W., 431.

---

FROM HAMILTON.

---

Appeal from the Criminal Court of Hamilton Coun-
ty.—M. M. Allison, Judge.

Pritchard & Sizer, for O'Neil.

Attorney-General Cates, Brown & Spurlock, and
H. P. Fry, for State.

MR. JUSTICE M'ALISTER delivered the opinion of the Court.

The plaintiff in error was convicted of practicing medicine and surgery in the county of Hamilton without having first procured a certificate of license from the State board of medical examiners, as required by chapter 78, Acts of the general assembly of the State of Tennessee, entitled "An act to regulate the practice of medicine and surgery in the State of Tennessee, and to define and punish offenses committed in violation of this act," etc.  Acts 1901, p. 115, c. 78.

The court thereupon assessed a fine of $25, together with the costs of the case, against the defendant, from which judgment he appealed, and has assigned errors.

The plaintiff in error relies on two assignments of error for a reversal of the judgment below, which are as follows:    (1)  That his professional business is not within the purview of the statute, for the reason that he is an optician within one of the two recognized definitions of that term, and is therefore expressly excepted from the operation of the statute.    (2)  Conceding that his business is comprehended by the statute, as applied to him, said statute is unconstitutional for two reasons: First.  His method of practice is not such as it is within the power of the legislature to regulate, restrict, or prohibit.  Second.  The regulation and requirements of the act, as applied to his methods of practice, are arbitrary and unjust, because his business does not re-

quire the qualifications prescribed by the statute for those undertaking to practice medicine and surgery.

The facts presented on the trial of the case in the court below are practically undisputed and embrace the following salient points: The plaintiff in error opened up an office in the city of Chattanooga, with all the arrangements necessary for the treatment of his patients. According to the testimony, the plaintiff in error would first subject his patients to a careful examination, including a microscopic test of a drop of blood taken from some part of the patient's body. He would then determine, from his diagnosis, the nature of the patient's ailment and whether or not it would require his treatment.

It is shown in the record that the method of treatment is practically uniform in all cases. "The patient is denuded of clothing and placed in a closed cabinet, and his body is thereupon subjected to the rays of two large electric arc lights, one being located in front of his body, and one at the back. This treatment is continued for about thirty minutes at each sitting, and then the patient, who is by this time in a profuse prespiration, is taken into another room and rubbed off, after which he goes about his business. In addition to this general treatment, a local application of the rays to the parts specially affected is made in some cases."

In addition to prescribing the light treatment as the means of treatment for his patients, the defendant gave medicines of various kinds, kept an account at a drug store where medicines were purchased, gave prescrip-

tions in the form of orders on the store of R. J. Miller, advised several of his patients to take certain patent medicines as an auxiliary to his treatment, and was addressed and known as Dr. O'Neil.

The record shows that defendant was accustomed to make a uniform charge of $100 in each case, for the application of the light treatment, but made no charge for medicines prescribed; hence he claimed that prescriptions were no part of his treatment.

Defendant did not deny that he had held himself out to the world as professing to treat disease, and it was not denied that defendant was practicing his profession without having received a license from the State board of medical examiners.

The plaintiff in error denominated his treatment as "the functional ray treatment." The philosophy of his treatment, as formulated by his counsel, is that the green and yellow rays of the spectrum possess in a greater degree than the other rays the power of building up and strengthening the tissues of the body and stimulating inactive organs by acting directly on the blood. He claims that by the use of chemicals he manufactures a carbon, the burning of which produces a light in which the yellow and green rays predominate, and from which the violet and ultra-violet rays, which are destructive to the tissues, are largely eliminated. "And it is a fact," continues the learned counsel, "well recognized among scientific men, that the application of such a light, in a certain class of diseases, and especially in

some that cannot be reached by ordinary medical methods, is highly beneficial."

It is claimed that the defendant's method of treatment differs from that of the ordinary physician, in that it is a light treatment exclusively, and the other doctors in Chattanooga have never used any method of light treatment except the "Finsen or X-Rays, the violet, germ-destroyer rays."

The question then propounded on the record is whether these facts bring the defendant's business within the purview of chapter .78, page 115, Acts 1901. The first section of that act provides that "no person shall practice medicine, in any of its departments, within this State, unless and until such person shall have obtained a certificate of license from the State board of medical examiners," created by the act. The eighteenth section imposes a fine of not less than $10 nor more than $25 on any person practicing medicine or surgery in the State without having complied with the requirements of the act. Section 19 is as follows: "That any person shall be regarded as practicing medicine within the meaning of this act, who shall treat, or profess to treat, operate on, or prescribe for any physical ailment, or any physical injury to, or deformity of another: Providing that nothing in this section shall be construed to apply to . . . veterinary surgeons, or osteopaths, not giving or using medicine in their practice, or to opticians, or to Christian scientists."

As already stated, the plaintiff in error claimed that

O'Neil v. State.

his business came within the term "optician," specially excluded from the operation of the act. On this subject, the court charged the jury that "an optician is a maker of optical instruments, and applies to a man that fits glasses to the eye."

The court then stated it was not necessary to charge the jury further on the question of "an optician, because the facts don't justify it."

The court further instructed the jury as follows: "If you find that this defendant opened an office in the city of Chattanooga, and that parties . . . went to him for consultation or advice, that he made an examination of them, . . . that he diagnosed their case, stated what was wrong with them, and then prescribed for and treated them—in other words, if he stated he could cure them with his 'functional ray treatment,' and that he placed then in a cabinet, and turned lights on them, and incidentally prescribed medicine and treated them in this way for their ailments—then the court charges you, . . . that he would come within the purview of this statute, and would be guilty under the law."

After the delivery of the general charge, counsel for the defendant submitted four requests for additional instructions, all of which were declined by the court.

The substance of the first two requests was that if the recommendation and administration of laxative and other similar remedies, by defendant, was only occasional and incidental, and not a part of his regular course of treatment, and no charge was made therefor,

115 Tenn.—28

this would not of itself constitute practicing medicine within the meaning of the statute.

The third request was as follows: "If the defendant's method of treatment is based entirely on the principles of the science of light, then he would be an optician, within one of the definitions of that term, and would be excepted from the operation of the statute."

The jury, after being in consultation for some time, returned into the room, and one of the jurors stated to the court "that some of their number would like to be instructed as to the meaning or construction of the words 'practicing medicine.' They want to know whether putting a patient into this device and applying the light to him would be construed as practicing medicine within the purview of this statute." Thereupon the court instructed the jury that "if the defendant made an examination of his patients, taking blood from the ear, and making a microscopical examination of the blood, and pronouncing what was wrong with him, and then treated him, by putting him in the cabinent and turning the lights on him, and attempting to perfect a cure in that way, that that would be such treatment as comes within the purview of this statute."

The first contention on behalf of the defendant is that he is an optician within the proviso of the statute, and counsel cite the Standard Dictionary as showing two recognized definitions of the term "optician:" (1) One who makes or deals in optical instruments or eyeglasses; (2) One who is versed in optics. The term

O'Neil v. State.

"optics," as defined by the Standard Dictionary, is "the science that treats of light and vision, the organs of sight, chromatics, and all that is connected with the phenomena of sight. It includes: (1) Geometrical optics; (2) physical optics, embracing (a) the undulatory theory, and the effects explained by it, as polarization, refraction, and interference; and (b) electro-optics, treating of the mutual relations of light and electricity; and (3) physiological optics, treating of such phenomena as depends on bodily function or brain action.

As already seen, the trial judge instructed the jury that defendant would not come within the term "optician" unless he made optical instruments, and declined to instruct the jury that defendant would be an optician if his method of treatment is based entirely on the principles of the science of light. It is insisted on behalf of the plaintiff in error that he is entitled to the benefit of this proviso, if his business or profession comes within either of the authorized definitions of the word "optician." And it is suggested, moreover, that it is not at all probable that the legislature, in this proviso intended to apply the term "optician" to makers of optical instruments, "since such a person neither treats, nor professes to treat, operates on, or prescribes for any physical ailment, or any physical injury to or deformity of another." And hence this general language would not have covered a mere maker of optical instruments. In other words, it is insisted that, under the charge of the trial judge, the exception in favor of "optician" is en-

tirely meaningless and inoperative; for the statute, without the exception, would not have applied to a "mere maker of optical instruments." It is contended, however, that one who treats or professes to treat disease by the operation of the principles of the science of light would fall within the general language of the section in question, but would be exempted from its operation by virtue of the proviso.

But it must be conceded that the definition of an optician given by the circuit judge is the common understanding of that term in practical life. He is usually understood to be a person who manufactures, sells, repairs, and dispenses instruments for the strengthening and preservation of the human eye, and who does not treat disease or operate surgically.

"It is a general rule that the words of a statute, if of common use, are to be taken in their natural and ordinary sense, and without any force or subtle construction to extend their meaning." *State, ex rel.,* v. *Turnpike Co.,* 2 Sneed, 90.

"The rule of construction is that words are to be construed according to their natural meaning, unless such a construction would render them senseless, or would be opposed to the general scope and intent of the instrument, or unless there be some very cogent reason of convenience in favor of a different interpretation."

"Where a word has both a popular and a technical meaning, the court will give it effect according to the popular signification."

"The courts approach the interpretation of a statute with the presumption that the words and phrases therein are used in their familiar and popular sense, and without any forced, technical, or subtle construction to limit or extend their meaning." Amer. and Eng. Ency. of Law, "Statutes."

Moreover, the proof in this record shows that plaintiff in error makes a microscopic examination of the blood in his diagnosis of disease, and also writes prescriptions and prescribes remedies, although it must be admitted that his principal mode of treatment is by the "functional ray." So that the plaintiff in error cannot claim that exemption, even under the very technical definition of an optican which he has invoked in this record.

The next question that arises is whether the court was correct in his response to the query propounded by one of the jurors to the effect that:

"If the defendant made an examination of his patients, taking blood from the ear and making a microscopic examination of the blood and pronouncing what was wrong with him, and then treated him by putting him in the cabinet and turning the lights on him and attempting to perfect a cure in that way, that would be such treatment as comes within the purview of this statute."

It will be remarked that the statute provides that:

"Any person shall be regarded as practicing medicine within the meaning of the act, who shall treat or profess to treat operate on or prescribe for any physical ail-

ment, or any physical injury to or deformity of another."

It is insisted by the State that defendant's conduct in first holding himself out as a healer of disease, receiving patients ascertaining what were the symptoms of their disease, directing as a remedy the light treatment supplemented by medicines, for all of which the defendant charged a fee, pursuing the business as a profession, was in direct contravention of the statute.

In the case of *Payne* v. *State,* 112 Tenn., 588, 79 S. W., 1025, it appeared that the plaintiff in error was engaged in advertising a patent medicine by making a speech or harangue to a crowd assembled in the open air. He said to the crowd that if anybody with a stiff neck or joint, headache, or rheumatism, or neuralgia, or a stiff hand would come on the stage, he would guarantee to cure him in five minutes with his liniment. People would accordingly go up to the stage, and the plaintiff in error would rub liniment on such as came, for the purpose of relieving the stiff neck or stiff hand, as the case might be. Again, plaintiff in error told another person that his medicine was good for stomach trouble and nervousness, and thereupon sold the patient a bottle of his medicine. He further stated that the directions were on the bottle, and the patient could increase or diminish the dose as his case might require. He also instructed the patient that it would benefit him to take a cold bath every morning, and that his diet should be eggs, buttermilk, and corn bread. The court held that these facts constituted

practicing medicine within the meaning of the act, and affirmed a judgment of conviction against the plaintiff in error for a violation of the statute. It was further said in that case that the term "practicing," in respect to the subject in connection with which it was used, indicates the pursuit of a business.

In the case of *Bibber* v. *Simpson,* 59 Me., 181, the court gave the following definition of what constitutes practicing medicine, viz.:

"The plaintiff was a clairvoyant. When asked to examine a patient, she saw the disease and felt as the patient did; gave sittings; did not pretend to understand anatomy or medicine; that she was requested to visit the intestate and render him professional services and did so that she helped him. The service was medical in its character. True, the plaintiff does not call herself a physician; but she visits her sick patients, examines their condition, determines the nature of the disease, and prescribes the remedies deemed by her most appropriate. Whether the plaintiff calls herself a medical clairvoyant or a clairvoyant physician, or a clear-seeing physician, matters little."

In the case of *People* v. *Phippin,* 70 Mich., 6, 37 N. W., 888, it appeared that the defendant was convicted in the lower court of practicing medicine without a license; the proof showing that he kept an office had a sign over his door with the words thereon, "Dr. Phippin, Magnetic Healer." Several parties visited him as a magnetic healer, and he treated them, and held himself out

to the community as a healer, and followed healing as a business. The supreme court of Michigan, in affirming the judgment of the court below, said:

"There is no good reason why restraint should not be placed upon the practice of medicine, as well as upon the practice of law. The public are more concerned in this than in the practice of law, and persons who engage in this profession require a special education to qualify them to practice. The great majority of the public know little of the anatomy of the human system and the nature of the ills that human flesh is heir to, and there is no profession, no occupation or calling in which people may be more readily imposed upon by charlatans. It is, however, an every day occurrence that people who are afflicted with disease will purchase and swallow all sorts of nostrums, because some quack has recommended it. Before the passage of the act in question, the people had no protection against quacks." *Parks* v. *State,* 159 Ind., 211, 64 N. E., 862, 59 L. R. A., 190.

In *State* v. *Van Doran,* 109 N. C., 867, 14 S. E., 32, it was held:

"An unlicensed person claiming to be a healer of disease, and holding himself out to the world as such, after examining a patient who has asked his services, diagnosing the disease, fixing the amount of the price to be asked, and giving him a prescription, cannot evade the law by proving that the medicine was a proprietary remedy prepared and sold by him."

O'Neil v. State.

In the American and English Encyclopaedia of Law, in the article on "Medicine," the following definition is given:

"The practice of medicine, as ordinarily or popularly understood, has relation to the art of preventing, curing, or alleviating disease or pain. It rests largely on a knowledge of anatomy, physiology, and hygiene. It requires a knowledge of disease, its anatomical and physiological features, and its causative relations. Popularly, it consists in the discovery of the cause and nature of disease, and the administration or the prescribing of treatment therefor."

It must be admitted that plaintiff in error, in the pursuit of his profession, has treated, professed to treat, operated on, and prescribed for the physical ailments and injuries of another with the intention of following same as a business. The determinative fact against the plaintiff in error on the record is that he is holding himself out to the world as a practitioner of the healing arts and is soliciting patients afflicted with disease for treatment.

The records show that plaintiff in error came to Chattanooga some time during the year 1904, and rented a suite of roms in the Chamberlain Building. He displayed certain signs advertising his business, one of which was, "O'Neil Institute," and another was, "H. Gibson O'Neil, Physiological Chemist." It appears that he was usually known and addressed by his patients and others as Dr. O'Neil, although there is testimony in the

record to the effect that on one or two occasions he objected to the title, saying he had "such a contempt for the medical profession." It further appears that the plaintiff in error sometimes visited patients who were too feeble to go to his office, and on one occasion he placed one of his cabinets at the home of a patient for the purpose of treating him.

In the case of *State* v. *Heath,* 125 Iowa, 585, 101 N. W., 429, the supreme court of Iowa, in upholding the medical act of that State said: "The power of the State to prescribe such restrictions and regulations in the practice of medicine as in the judgment of the legislature shall protect the people from the consequences of ignorance and incapacity, as well as deception and fraud, has been vindicated too often to require citation of authority. The statutes do not attempt to discriminate between different schools of medicine or systems for the cure of the sick. No method to heal the sick, no matter how occult, is prohibited. All that the law exacts is that, whatever the system, the practitioner shall be possessed of a certificate from the State board of medical examiners, and shall exercise such reasonable skill and care as are usually possessed by practitioners in good standing of that system in the vicinity in which they practice. This excludes no one from the profession, but requires all to attain reasonable proficiency in certain subjects essential to the appreciation of physical conditions to be affected by treatment. The object is not to make any particular mode of effecting a cure unlaw-

O'Neil v. State.

ful, but simply to protect the public from empiricism. Often the individual suffers from want of proper attention, but in cases of contagious or infectious diseases, the entire community may be endangered. In no profession, occupation, or calling are the people more easily or more readily imposed upon. Surely it is not unreasonable to demand of every one who professes to treat disease some knowledge of the disease, its origin, its anatomical and physiological features, and its causative relations, and the effects of drugs. At any rate, the State, in order to guard the people, had the right to exact such knowledge."

"It is and has been a great question as to what extent must the individual right be subordinated to the public. There are a great many burdens imposed under the police power. Criminals are deprived of their liberty; implements of vice are destroyed; vice and barbarism are controlled; noxious trades are regulated and nuisances are suppressed; children are required to attend school, and the property of infants and persons *non compos* is placed in the control of others; the construction of buildings in populous neighborhoods is regulated; provision is made for the greater safety of passengers upon railways and steamboats; employers are required to provide safe places in which the work of their employees can be done; hours of work in employments deleterious to the health are limited; the employment of children in factories prohibited; pure food laws enacted; physicians, dentists, and druggists licensed; and so the list might be expanded by specific

instances of authorities of legislative regulations enforc-
ing the social compact for the protection of life, health,
morals, property, and the general weal of the commu-
nity." etc. *Slaughter House Cases,* 16 Wall., 36, 21 L.
Ed., 394; 4 Blackstone's Commentaries, 162; *Holden* v.
*Hardie,* 169 U. S., 366, 18 Sup. Ct., 383, 42 L. Ed., 780.

"Few professions require more careful preparations by
one who seeks to enter it than medicine. It has to deal
with those subtle and mysterious influences upon which
life and health depend, and requires a knowledge, not
only of the properties of vegetable and mineral sub-
stances, but of the human body in all its complicated
forms and their relation to each other, as well as their
influence on the mind. The physician must be able to
detect readily the presence of disease and prescribe ap-
propriate remedies for its removal. Every one may have
occasion to consult him, but comparatively few can
judge of the qualifications of learning and skill he pos-
sesses. Reliance must be placed upon the assurances
given by his license, issued by an authority competent
to judge in that respect, that he possesses the requisite
qualifications." *Ex parte Virginia,* 100 U. S., 339, 25
L. Ed., 676.

"The practice of medicine is a mere privilege, on the
exercise of which the State may impose such conditions
as it deems best and advisable." *State* v. *Edmunds*
(Iowa), 101 N. W., 431.

Without further discussion and citation of authori-
ties, we are of opinion there was no error in the judg-
ment, and the same is affirmed.