## John Thomas Scopes v. The State.[*]

### (*Nashville,* December Term, 1926.)

Opinion filed January 17, 1927.

1. CRIMINAL LAW. Theory of evolution. Public schools. Acts 1925. chapter 27.

"An Act prohibiting the teaching of the Evolution Theory in all the Universities, Normals and all other public schools of Tennessee, which are supported in whole, or in part, by the public school funds of the State, and to provide penalties for the violation, thereof."

"Section 1. Be it enacted by the General Assembly of the State of Tennessee, That it shall be unlawful for any teacher in any of the Universities, Normals, and all other public schools of the State, which are supported in whole or in- part by the public school funds of the State, to teach any theory that denies the story of the Divine Creation of man, as taught in the Bible, and to teach instead, that man has descended from a lower order of animals."

"Section 2. Be it further enacted, That any teacher found guilty of the violation of this Act, shall be guilty of a misdemeanor and upon conviction, shall be fined not less than one hundred ($100) dollars, nor more than five hundred ($500) dollars, for each offense."

"Section 3. Be it further enacted, That this Act take effect from and after its passage, the public welfare requiring it."

Held, a valid enactment.

Dissenting. Mr. Justice McKinney, being of opinion that the Act is invalid for uncertainty. (Post, p. 129.)

---

[*]As to necessity of following language of statute defining offense in indictment, see 14 R. C. L., pp. 185, 187; 3 R. C. L. Supp., 191, 4 R. C. L. Supp., 885, 5 R. C. L. Supp., 751; 6 R. C. L. Supp., 802.

Citing: Connally v. General Construction Co., 46 U. S. Sup. Ct. Rep., 126; International Harvester Co. v. Kentucky, 234 U. S., 216, 221, 34 S. Ct., 853, 58 L. Ed., 1284; Collins v. Kentucky, 234 U. S., 638, 34 S. Ct., 924, 58 L. Ed., 1510.

2. SAME. Same. Same. Same.

The Act (Acts 1925, ch. 27), may be construed as only aimed at "Materialists," having reference to the two theories of organic evolution; the theistic and materialistic. (Post, p. 121.)

Concurring opinion of Mr. Justice Chambliss.

3. CRIMINAL LAW. Indictment. Language of Statute.

A statute, being sufficiently definite in its terms, an indictment following its language is good. (Post, p. 111.)

Citing: Lewis' Sutherland Stat. Const., sec. 414, et seq.; Caldwell & Co. v. Lea, 152 Tenn., 48; State v. Odom, 70 Tenn. (2 Lea), 220; Villines v. State, 96 Tenn., 141; Griffin v. State, 109 Tenn., 17.

Const. of Tenn., art. 1, sec. 8; U. S. Const., 14th Amendment, sec. 1.

4. PUBLIC SCHOOLS. Teachers. Proprietary right of State.

A teacher employed by the State, or by a municipal agency for it, must serve the state upon terms as prescribed by the state, which is not hampered by limitations of its own Constitution, nor of the Amendment to the Constitution of the United States. (Post, p. 112.)

Citing: Sec. 1, art. 8, State Constitution; 14th Amendment to Constitution of United States; Acts, 1899, ch. 205.

Citing: People v. Crane, 214 N. Y., 154; Heim v. McCall, 239 U. S., 175, 60 L. Ed., 207; Truax v. Raich, 239 U. S., 33, 60 L. Ed., 131; Atkin v. Kansas, 191 U. S., 207, 48 L. Ed., 148; Ellis v. United States, 206 U. S., 246, 51 L. Ed., 1047; Waugh v. Board of Trustees, 237 U. S., 589, 59 L. Ed., 1131; Leeper v. State, 103 Tenn., 500; Marshall & Bruce Co. v. City of Nashville, 109 Tenn., 459.

Citing and distinguishing: Truax v. Raich, supra; Meyer v. Nebraska, 262 U. S., 390; Pierce v. Society of Sisters of the Holy Name, 268 U. S., 510.

5. **CONSTITUTION. Construction. Article XI, sec. 12, directory.**
Article XI, section 12, of the State Constitution, providing "It shall be the duty of the general assembly in all future periods of this government to cherish literature and science," held this particular admonition must be treated as directory, and too vague to be enforced. (Post, p. 116.)

Citing: Green v. Allen, 24 Tenn. (5 Humph.), 170; State v. Burrow, 119 Tenn., 376; Webb v. Carter, 129 Tenn., 182; Ewell v. Sneed, 136 Tenn., 602.

6. **STATUTE. Enactment. Motive of Legislature.**
The validity of a statute must be determined by its natural and legal effect, rather than proclaimed motives of the law makers. (Post, p. 120.)

Citing: Lochner v. New York, 198 U. S., 45; Grainger v. Douglas, Park Jockey Club, 148 Fed., 513; 6 R. C. L., Ill., 81.

7. **CRIMINAL LAW. Fine, exceeding $50. Constitution, Article 6, section 14.**
Under section 14; article 6, of the Constitution, a fine exceeding $50 must be assessed by the jury. It is error where defendant is found guilty of a misdemeanor, and the jury do not assess the fine; for the trial judge to attempt to impose the minimum fine prescribed by the Statute, exceeding $50. (Post, p. 121.)

---

*Headnotes 1. Statutes, 36 Cyc., p. 1043; 2. Statutes, 36 Cyc., p. 969; 3. Indictment and Information, 31 C. J., section 260; 4. Constitutional Law, 12 C. J., section 825 (Anno.); 5. Constitutional Law, 12 C. J., section 145; 6. Schools and School Districts, 35 Cyc., p. 1127 (Anno.); 7. Criminal Law, 17 C. J., section 3719.

---

FROM RHEA.

---

Appeal from the Criminal Court of Rhea County.—
HON. J. T. RAULSTON, Judge.

JOHN R. NEAL, CLARENCE DARROW, ARTHUR G. HAYES, DUDLEY FIELD MALONE, WILLIAM T. THOMAS, and FRANK B. MCELWEE, for plaintiff in error.

THOMAS H. MALONE and HENRY E. COLTON *amici curiae* for appellant.

FRANK M. THOMPSON, Attorney-General, ED. T. SEAY, and K. T. MCCONNICO, for defendant in error.

CHIEF JUSTICE GREEN delivered majority opinion; JUDGE CHAMBLISS concurring opinion, and JUSTICE COOK concurred; JUDGE COLIN P. MCKINNEY, opinion dissenting, and JUDGE SWIGGART did not participate.

Scopes was convicted of a violation of chapter 27 of the Acts of 1925 for that he did teach in the public schools of Rhea county a certain theory that denied the story of the divine creation of man, as taught in the Bible, and did teach instead thereof that man had descended from a lower order of animals. After a verdict of guilty by the jury, the trial judge imposed a fine of $100, and Scopes brought the case to this court by an appeal in the nature of a writ of error.

The bill of exceptions was not filed within the time fixed by the court below and upon motion of the State, at the last term, this bill of exceptions was stricken from the record. *Scopes* v. *The State,* 152 Tenn., 424.

A motion to quash the indictment was seasonably made in the trial court raising several questions as to the sufficiency thereof and as to the validity and construction of the Statute upon which the indictment rested. These questions appear on the record before us and have been presented and debated in this court with great elaboration.

Chapter 27 of the Acts of 1925, known as the Tennessee Anti-evolution Act is set out in the margin.

While the Act was not drafted with as much care as could have been desired, nevertheless, there seems to be no great difficulty in determining its meaning. It is entitled "An Act prohibiting the teaching of the evolution theory in all the Universities, Normals and all other public schools of Tennessee, which are supported in whole or in part by the public school funds of the State, and to provide penalties for the violations thereof."

*Evolution* like *prohibition* is a broad term. In recent bickering, however, evolution has been understood to mean the theory which holds that man has developed from some pre-existing lower type. This is the popular significance of evolution, just as the popular significance of prohibition is prohibition of the traffic in intoxicating liquors. It was in this sense that evolution was used in this Act. It is in this sense that the word will be used in this opinion, unless the context otherwise indictes. It is only to the theory of the evolution of man from a lower type that the Act before us was intended to apply, and much of the discussion we have heard is beside this case. The words of a Statute, if in common use, are to be taken in their natural and ordinary sense. *O'Neill* v. *State,* 115 Tenn., 427; *State ex rel.* v. *Turnpike Co.,* 34 Tenn. (2 Sneed), 90.

Thus definding evolution the Act's title clearly indicates the purpose of the Statute to be the prohibition of t.. "hing in the Schools of the State that man has developed or descended from some lower type or order of animals.

When the draftsman came to ꭩ ꭢress this purpose in the body of the Act he first fc⁻꭫ꭢꭤ the teaching of "any

theory that denies the story of the divine creation of man as taught in the Bible"—his conception evidently being that to forbid the denial of the Bible story would ban the teaching of evolution. To make the purpose more explicit he added that it should be unlawful to teach "that man has descended from a lower order of animals."

Supplying the ellipsis in section 1 of the Act, it reads that it shall be unlawful for any teacher, etc., "to teach any theory that denies the story of the divine creation of man as taught in the Bible, and to teach instead (of the story of the divine creation of man as taught in the Bible) that man has descended from a lower order of animals."

The language just quoted illustrates what is called in rhetoric exposition by iteration. The different form of the iterated idea serves to expound the first expression of the thought. The undertaking of the Statute was to prevent teaching of the evolution theory. It was considered this purpose could be effected by forbidding the teaching of any theory that denied the Bible story, but to make the purpose clear it was also forbidden to teach that man descended from a lower order of animals.

This manner of expression in written instruments is common and give use to the maxim of construction *noscitur a sociis.* Under this maxim subordinate words and phrases are modified and limited to harmonize with each other and with the leading and controlling purpose or intention of the Act. For examples see Lewis' Sutherland Stat. Const., sec. 414, et seq.; *Caldwell & Co.* v. *Lea,* 152 Tenn. 48.

It thus seems plain that the Legislature in this enactment only intended to forbid teaching that man descended

from a lower order of animals. The denunciation of any theory denying the Bible story of creation is restricted by the caption and by the final clause of section 1.

So interpreted the Statute does not seem to be uncertain in its meaning nor incapable of enforcement for such a reason, notwithstanding the great argument to the contrary. The indictment herein follows the language of the Statute. The Statute being sufficiently definite in its terms, such an indictment is good. *State* v. *Odom,* 70 Tenn., (2 Lea), 220; *Villines* v. *State,* 96 Tenn., 141; *Griffin* v. *State,* 109 Tenn., 17. The assignments of error which challenge the sufficiency of the indictment and the certainty of the Act are accordingly overruled.

It is contended that the Statute violates section 8 of article 1 of the Tennessee Constitution, and section 1 of the Fourteenth Amendment to the Constitution of the United States—the Law of the Land clause of the State Constitution, and the Due Process of Law clause of the Federal Constitution, which are practically equivalent in meaning.

We think there is little merit in this contention. The plaintiff in error was a teacher in the public schools of Rhea county. He was an employee of the State of Tennessee or of a municipal agency of the State. He was under contract with the State to work in an institution of the State. He had no right or privilege to serve the State except upon such terms as the State prescribed. His liberty, his privilege, his immunity to teach and proclaim the theory of evolution, elsewhere than in the service of the State, was in no wise touched by this law.

The Statute before us is not an exercise of the police power of the State undertaking to regulate the conduct

and contracts of individuals in their dealings with each other. On the other hand it is an Act of the State as a corporation, a proprietor, an employer. It is a declaration of a master as to the character of work the master's servant shall, or rather shall not, perform. In dealing with its own employees engaged upon its own work, the State is not hampered by the limitations of section 8 of article 1 of the Tennessee Constitution, nor of the Fourteenth Amendment to the Constitution of the United States.

In *People* v. *Crane,* 214 N. Y., 154, the validity of a Statute of that State providing that citizens only should be employed upon public works was sustained. In the course of opinion, p. 175, it was said:

"The statute is nothing more, in effect, than a resolve by an employer as to the character of his employees. An individual employer would communicate the resolve to his subordinates by written instructions or by word of mouth. The State, an incorporeal master, speaking through the Legislature, communicates the resolve to its agents by enacting a statute. Either the private employer or the State can revoke the resolve at will. Entire liberty of action in these respects is essential unless the State is to be deprived of a right which has heretofore been deemed a constitutent element of the relationship of master and servant, namely the right of the master to say who his servants shall (and therefore shall not) be."

A case involving the same Statute reached the Supreme Court of the United States and the integrity of the Statute was sustained by that tribunal. *Heim* v. *McCall,* 239 U. S., 175, 60 L. Ed., 207. The Supreme Court referred

to *People* v. *Crane,* supra, and approvingly quoted a portion of the language of BARRETT, Chief Judge, that we have set out above.

At the same term of the Supreme Court of the United States an Arizona Statute prohibiting individuals and corporations with more than five workers from employing less than eighty percent thereof of qualfied electors or native born citizens of the United States was held invalid. *Truax* v. *Raich,* 239 U. S., 33, 60 L. Ed., 131.

These two cases from the Supreme Court make plain the differing tests to be applied to a Statute regulating the State's own affairs and a Statute regulating the affairs of private individuals and corporations.

A leading case is *Atkin* v. *Kansas,* 191 U. S., 207, 48 L. Ed., 148. The court there considered and upheld a Kansas Statute making it a criminal offense for a contractor for a public work to permit or require an employee to perform labor upon that work in excess of eight hours each day. In that case it was laid down:

". . . For whatever may have been the motives controlling the enactment of the statute in question, we can imagine no possible ground to dispute the power of the State to declare that no one undertaking work for it or for one of its municipal agencies should permit or require an employee on such work to labor in excess of eight hours each day, and to inflict punishment upon those who are embraced by such regulations and yet disregard them. It cannot be deemed a part of the liberty of any contractor that he be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the State. On the contrary, it belongs to the State, as the guardian and trustee for its people, and

154 Tenn.—8.

having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern.''

In *Ellis* v. *United States,* 206 U. S., 246, 51 L. Ed., 1047, *Atkin* v. *Kansas,* was followed and an Act of Congress sustained which prohibited, under penalty of fine or imprisonment, except in case of extraordinary emergency, the requiring or permitting laborers or mechanics employed upon any of the public works of the United States or of the District of Columbia to work more than eight hours each day.

These cases make it obvious that the State or Government, as an incident to its power to authorize and enforce contracts for public service, ''may require that they shall be carried out only in a way consistent with its views of public policy and punish a departure from that way.'' *Ellis* v. *United States,* supra.

To the same general effect is *Waugh* v. *Board of Trustees,* 237 U. S., 589, 59 L. Ed., 1131, in which a Mississippi Statute was sanctioned that prohibited the existence of Greek letter fraternities and similar societies in the State's educational institutions, and deprived members of such societies of the right to receive or compete for diplomas, class honors, etc.

This court has indicated a like view in *Leeper* v. *The State,* 103 Tenn., 500, in which the constitutionality of chapter 205 of the Acts of 1899, known as the ''Uniform Text Book Law,'' was sustained. In the opinion in that

case, Judge WILKES observed "If the authority to regulate and control schools in legislative, then it must have an unrestricted right to prescribe methods, and the courts cannot interfere with it unless some scheme is devised which is contrary to other provisions of the Constitution. . . ."

In *Marshall & Bruce Co.* v. *City of Nashville,* 109 Tenn., 459, the charter of the City of Nashville required that all contracts for goods and supplies furnished the city, amounting to over $50, must be let out at competitive biddings to the lowest responsible bidder. In the face of such a charter provision, an ordinance of the city, which provided that all city printing should bear the union label, was held unauthorized. Necessarily so. The lowest bidder, provided he was responsible, was entitled to such a contract, whether he employed union labor, and was empowered to affix the union label to his work, or not. Other things said in that case were not necessary to the decision.

*Truax* v. *Raich,* supra; *Meyer* v. *Nebraska,* 262 U. S., 390; *Pierce* v. *Society of Sisters of the Holy Name,* 268 U. S., 510, and other decisions of the Supreme Court of the United States, pressed upon us by counsel for plaintiff in error deal with Statutes affecting individuals, corporations and private institutions, and we do not regard these cases as in point.

Since the State may prescribe the character and the hours of labor of the employees on its works, just as freely may it say what kind of work shall be performed in its service—what shall be taught in its schools, so far at least as section 8 of article 1 of the Tennessee Consti-

tution, and the Fourteenth Amendment to the Constitution of the United States are concerned.

But it is urged that chapter 27 of the Acts of 1925 conflicts with section 12 of article 11, the Education clause, and section 3 of article 1, the Religious Preference clause of the Tennessee Constitution. It is to be doubted if the plaintiff in error, before us only as the State's employee, is sufficiently protected by these constitutional provisions to justify him in raising such questions. Nevertheless as the State appears to concede that these objections are properly here made, the court will consider them.

The relevant portion of section 12 of article 11 of the Constitution is in these words:

". . . It shall be the duty of the General Assembly in all future periods of this government to cherish Literature and Science."

The argument is that the theory of the descent of man from a lower order of animals is now established by the preponderance of scientific thought and that the prohibition of the teaching of such theory is a violation of the legislative duty to cherish Science.

While this clause of the Constitution has been mentioned in several of our cases, these references have been casual, and no Act of the Legislature has ever been held inoperative by reason of such provision. In one of the opinions in *Green* v. *Allen,* 24 Tenn. (5 Humph.), 170, the provision was said to be directory. Although this court is loath to say that any language of the Constitution is merely directory, *State* v. *Burrow,* 119 Tenn., 376; *Webb* v. *Carter,* 129 Tenn., 182, we are driven to the conclusion that this particular admonition must be so treated. It

is too vague to be enforced by any court.  To cherish Science means to nourish, to encourage, to foster Science.

In no case can the court directly compel the Legislature to perform its duty.  In a plain case the court can prevent the Legislature from transgressing its duty under the Constitution by declaring ineffective such a legislative Act.  The case, however, must be plain and the legislative Act is always given the benefit of any doubt.

If a bequest were made to a private trustee with the avails of which he should cherish Science and there was nothing more, such a bequest would be void for uncertainty.  *Green* v. *Allen,* 24 Tenn. (5 Humph.), 17*; *Ewell* v. *Sneed,* 136 Tenn., 602, and cases cited.  It could not be enforced as a charitable use in the absence of prerogative power in this respect which the courts of Tennessee do not possess.  A bequest in such terms would be so indefinite that our courts could not direct a proper application of the trust fund nor prevent its misapplication. The objects of such a trust could not be ascertained.

If then the courts of Tennessee are without power to direct the administration of such a trust by an individual, how can they supervise the administration of such a trust by the Legislature?  It is a matter of far more delicacy to undertake the restriction of a co-ordinate branch of government to the terms of a trust imposed by the Constitution than to confine an individual trustee to the terms of the instrument under which he functions. If language be so indefinite as to preclude judicial restraint of an individual, such language could not possibly excuse judicial restraint of the General Assembly.

If the Legislature thinks that by reason of popular prejudice, the cause of education and the study of Science

generally will be promoted for forbidding the teaching of evolution in the schools of the State, we can conceive of no ground to justify the courts' interference. The courts cannot sit in judgment on such Acts of the Legislature or its agents and determine whether, or not, the omission or addition of a particular course of study tends "to cherish Science." ]

The last serious criticism made o. 'he Act is that it contravenes the provision of section 3 of article 1 of the Constitution, "that no preference shall ever be given by law to any religious establishment or mode of worship." . .

The language quoted is a part of our Bill of Rights, was contained in the first Constitution of the State adopted in 1796, and has been brought down into the present Constitution.

At the time of the adoption of our first Constitution, this government had recently been established and the recollection of previous conditions was fresh. England and Scotland maintained State churches as did some of the Colonies, and it was intended by this clause of the Constitution to prevent any such undertaking in Tennessee.

We are not able to see how the prohibition of teaching the theory that man has descended from a lower order of animals gives preference to any religious establishment or mode of worship. So far as we know there is no religious establishment or organized body that has its creed or confession of faith any article denying or affirming such a theory. So far as we know the denial or affirmation of such a theory does not enter into any recognized mode of worship. Since this cause has been

pending in this court, we have been favored, in addition to briefs of counsel and various *amici curiae,* with a multitude of resolutions, addresses and communications from scientific bodies, religious factions, and individuals giving us the benefit of their views upon the theory of evoluton. Examination of these contributions indicates that Protestants, Catholics, and Jews are divided among themselves in their· beliefs, and that there is no unanimity among the members of any religious establishment as to this subject. Belief or unbelief in the theory of evolution is no more a characteristic of any religious establishment or mode of worship than is belief or unbelief in the wisdom of the prohibition laws. It would appear that members of the same churches quite generally disagree as to these things. ·

Furthermore, chapter 27 of the Acts of 1925 *requires* the teaching of nothing. It only forbids the teaching of the evolution of man from a lower order of animals. Chapter 102 of the Acts of 1915 requires that ten verses from the Bible be. read each day at the opening of every public school, without comment and provided the teacher does not read the same verses more than twice during any session. It is also provided in this Act that pupils may be excused from the Bible readings upon the written request of their parents.

As the law thus stands, while the theory of evolution of man may not be taught in the schools of the State, nothing contrary to that theory is required to be taught. It could scarcely be said that the statutory scriptural reading just mentioned would amount to the teaching of a contrary theory.

Our school authorities are, therefore, quite free to determine how they shall act in this state of the law. Those in charge of the educational affairs of the State are men and women of discernment and culture. If they believe that the teaching of the Science of Biology has been so hampered by chapter 27 of the Acts of 1925 as to render such an effort no longer desirable, this course of study may be entirely omitted from the curriculum of our schools. If this be regarded as a misfortune, it must be charged to the Legislature. It should be repeated that the Act of 1925 deals with nothing but the evolution of man from a lower order of animals.

It is not necessary now to determine the exact scope of the Religious Preference clause of the Constitution and other language of that section. The situation does not call for such an attempt. Section 3 of article 1 is binding alike on the Legislature, and the school authorities. So far, we are clear that the Legislature has not crossed these constitutional limitations. If hereafter, the school authorities should go beyond such limits, a case can then be brought to the courts.

[Much has been said in argument about the motives of the Legislature in passing this Act. But the validity of a Statute must be determined by its natural and legal effect, rather than proclaimed motives.] *Lochner* v. *New York,* 198 U. S. 45; *Grainger* v. *Douglas Park Jockey Club,* 148 Fed. 513; 6 R. C. L. 111, 81.

Some other questions are made but in our opinion they do not merit discussion, and the assignments of error raising such questions are overruled. \

This record discloses that the jury found the defendant below guilty but did not assess the fine. The trial

judge himself undertook to impose the minimum fine of
$100 authorized by the Statute. This was error. Under
section 14 of article 6 of the Constitution of Tennessee,
a fine in excess of $50 must be assessed by a jury. The
Statute before us does not permit the imposition of a
smaller fine than $100.

Since a jury alone can impose the penalty this Act re-
quires and as a matter of course no different penalty
can be inflicted, the trial judge exceeded his jurisdiction
in levying this fine and we are without power to correct
his error. The judgment must accordingly be reversed.
*Upchurch* v. *The State,* 153 Tenn., 198.

The court is informed that the plaintiff in error is no
longer in the service of the State. We see nothing to
be gained by prolonging the life of this bizarre case. On
the contrary we think the peace and dignity of the State,
which all criminal prosecutions are brought to redress,
will be the better conserved by the entry of a *nolle prose-
qui* herein. Such a course is suggested to the Attorney-
General.

Mr. Justice SWIGGART took no part in the decision. He
came on this bench upon the death of Mr. Justice HALL,
after the argument and submission hereof.

CHAMBLISS, J. (concurring.)

While I concur in the conclusions announced by Chief
Justice GREEN, and agree, as so ably shown by him, that
it is within the power of the Legislature to so prescribe
the public school curriculum as to prohibit the teaching
of the evolution of man from a lower order of animal
life, even though the teaching of some branches of sci-

ence may be thereby restricted, I am of opinion that the constitutional objections urged do not apply for yet other reasons, and in another view.

Two theories of organic evolution are well recognized, one the *theistic,* which not only concedes, but maintains, consistently with the Bible story, that "the Lord God formed man of the dust of the earth, and breathed into his nostrils the breath of life, and man became a living soul." This is the theory advanced eloquently by learned counsel for Scopes, and held to by numerous outstanding scientists of the world. The other theory is known as the *materialistic,* which denies that God created man—that He was the First Cause—and seeks in shadowy uncertainties for the origin of life. The act before us, as I view it, prohibits the teaching in the public schools of the State of this latter theory—inconsistent, not only with the common belief of mankind of every clime and creed and "religious establishment"—even those that reject Christ or Judaism, and look thru Budda or Mohammed to God—but inconsistent also with our Constitution and the fundamental declarations lying back of it, through all of which runs recognition of and appeal to "God," and a life to come. The Declaration of Independence opens with a reference to "the laws of nature and of nature's God," and holds this truth "to be self-evident, that all men are created equal; that they are endowed by their Creator," etc., and concludes "with a firm reliance on the protection of Divine Providence." The Articles of Confederation and Perpetual Union read—"And whereas, it hath pleased the Great Governor of the world." And so section 3 of article 1 of the Constitution of this State, which declares that "no prefer-

ence shall ever be given, by law, to any religious establishment," opens with the declaration, "that all men have a natural and indefeasible right to worship Almighty God,"—while section 2 of article 9 declares that "no person who denies the being of God, or a future state of rewards and punishments, shall hold any office in the Civil department of this State." That the Legislature may prohibit the teaching to the future citizens and office holders of the State of a theory which denies the Divine Creator will hardly be denied.

Now, I find it conceded in an exceptionally able brief for Scopes, devoted exclusively to the question of uncertainty, that "the act might be construed as only aimed at materialists." This is my view of it. As I read it, the act makes no war on evolution, except insofar as the evolution theory conflicts with the recognition of the Divine in creation.

While it is conceded that the language is in some respects ambiguous, analysis of the caption and body of the act as a whole appears to sustain this view. The variance between the caption and the body of the act is significant. The caption refers broadly to "the Evolution Theory," but it is clear that the act itself, as finally framed and passed, was expressly limited and restricted in its body to the prohibition of the teaching—not of *any* theory of evolution at all, but of any theory only that denies or controverts "the Divine Creation of man." While the language used is, "any theory that denies *the story of* the Divine Creation of man *as taught in the Bible*," the italicized phraseology may be said to be descriptive only of the essential matter. It may be insisted that these words, when given their proper force,

serve to narrow the meaning of the act so as to confine
its operation to prohibition against the denial of the
Divine Creation of man to the story taught in the Bible
as interpreted by those·literalists who hold to the in-
stantaneous creation view.   In reply, it may be said that
however plausible may be this construction or application
of this language, it must be rejected on the very grounds
emphasized by learned counsel, who adopt it and then
proceed to predicate thereon their argument for the
unconstitutionality of the act.   The courts may go far
to avoid a construction which will destroy the act.   This
is axiomatic.   One may not consistently contend for a
construction of language at all open to construction,
which if applied will make void the act.   Moreover, it
would seem that, since "the story  .  .  .  as taught in
the Bible" of man's creation by God from the dust of
the earth is readily susceptible of the construction given
it by those known as liberalists, this language is consist-
ent with the conclusion that what the act aims at and
effects is the prohibition of the teaching of any such the-
ory only as denies that man was *divinely created* accord-
ing to the Bible story, *however this story may be inter-
preted as to details.*   So long as the story as told in the
Bible is so construed as to recognize the Divine creation
of man, these words have no limiting effect upon the cen-
tral and essential object of the act as hereinbefore sug-
gested—to restrain the inculcation into the minds of pu-
pils of the public schools of any theory that denies the
Divine Creation of man, and on the contrary traces his
origin, *in exclusion of the Divine,* to a lower order of ani-
mal life.   It is this materialistic teaching which is de-
nounced; and so construed, the act may clearly be sus-
tained, negative only as it is, first, of the right to teach in

the public schools a denial of the existence, recognized by our Constitution, of the Creator of all mankind; and, second, of the right to teach any theory which involves the support or advocacy of either, or any, religious dogma or view.

The concluding phrase, ''and to teach instead that man has descended from a lower order of animals,'' is added on the apparent assumption that such teaching involves a denial, which the preceding clause prohibits, of Divine creation. The use of this language, aptly defined by our learned Chief Justice as a species of iteration, for the purpose of emphasis, indicates an intention to set over, one against the other, the theory, or ''story,'' of man's Divine creation—and the antagonistic and materialistic theory, or ''story,'' of his origin in the animal kingdom, to the exclusion of God. The phraseology is antithetical—a favorite form of strengthening statement. ''Measures, not men.'' Springing from God, not animals. The two theories of man's origin are placed in direct opposition, the manifest purpose being to emaphasize the essence of the thing prohibited—the teaching of a denial of man's Divine creation.

The following statement of Dr. E. E. Reinke, Professor of Biology in Vanderbilt University, is repeatedly quoted in briefs of counsel for the defense:

''The theory of evolution is altogether essential to the teaching of biology and its kindred sciences. To deny the teacher of biology the use of this most fundamental generalization of his science would make his teaching as chaotic as an attempt to teach astronomy without the law of gravitation or physics without assuming the existence of the ether.''

Conceding that "the theory of evolution is altogether essential to the teaching of biology and its kindred sciences," it will not be contended by Dr. Reinke, or by learned counsel quoting from him, that the theory of evolution essentially involves the denial of the Divine creation of man, and that, when construed to prohibit such a denial only, the act is objectionable as denying to "the teacher of biology the use of this most fundamental generalization of his science."

Now, in this view it is clear that the constitutional direction to cherish education and science is not disregarded. The teaching of all science may have full legitimate sway, with the restriction only that the teaching shall not convey a denial of man's Divine origin—God as his Creator. The theories of Drummond, Winchell, Fiske, Hibbens, Millikan, Kenn, Merriam, Angell, Canon Barnes and a multitude of others, whose names are invoked in argument and brief, do not deny the story of the Divine creation of man as taught in the Bible, evolutionists though they be, but construing the scripture for themselves, in the light of their learning, accept it as true, and their teaching would not come under the ban of this act.

Much that has been said bears directly upon the contention that section 3, article 1 of our Constitution is violated, in that a perference is given by law to those "religious establishments which have as one of their tenets or dogmas the instantaneous creation of man." As said by Chief Justice GREEN, the act gives no preference to any particular religious establishment. The doctrine or tenet of the instantaneous creation of man is not set forth or preferred over other conceptions. It is too well established for argument that "the story of the Divine creation of man as taught in the Bible" is

accepted—not "denied"—by millions of men and women who do not interpret it as teaching instantaneous creation—who hold with the Psalmist that "a thousand years in thy sight are but as yesterday when it is past"—as but a day. It follows that to forbid the teaching of a denial of the biblical account of Divine creation does not, expressly, or by fair implication, involve acceptance or approval of instantaneous creation, held to by some literalists. One is not prohibited by this act from teaching, either that "days," as used in the book of Genesis, means days of twenty-four hours, the literalist view, or days of "a thousand years," or more, as held by liberalists, so long as the teaching does not exclude God as the author of human life.

Considering the caption and body of this act as a whole, it is seen to be clearly negative only, not affirmative. It requires nothing to be taught. It prohibits, merely. And it prohibits, not the teaching of *any* theory of evolution, but that theory (of evolution) only that denies—takes issue with, positively disaffirms—the creation of man by God (as the Bible teaches), and that, instead of being so created, he is a product of, springs from, a lower order of animals. No authority is recognized or conferred by the laws of this State for the teaching in the public schools, on the one hand, of the Bible, or of any of its doctrines or dogmas—and this act prohibits the teaching, on the other hand, of any denial thereof. It is purely an act of neutrality. Ceaseless and irreconcilable controversy exists among our citizens and taxpayers, having equal rights, touching matters of religious faith, and it is within the power of the Legislature to declare that the subject shall be excluded from tax supported in-

stitutions—that the State shall stand neutral—rendering "unto Caesar the things which be Caesar's and unto God the things which be God's," and insuring the completeness of separation of Church and State.

In the light of this interpretation is the act void for uncertainty? I think not. If the act were affirmative in its requirements, calling for the teaching of *some* theory, the objection would be more plausible. A clear chart is more necessary when one must move, over matter or in mind, than when one is required merely *not* to act or teach. Any reasonable intelligence should be able to understand and observe the plain prohibition against instilling into the minds of the pupil a denial that he is a creation of God, but rather a product of the beast of the field; against teaching—and the term is here employed in the sense of seeking to convince—the pupil affirmatively that his origin is not Divine, but material, through the animal. He who runs may read. He need do no guessing as to what particular conception or view of the Bible account he shall teach. The act does not require that he choose between the fundamentalist and the modernist, the literalist and the liberalist. Our laws approve no teaching of the Bible at all in the public schools, but require only that no theory shall be taught which denies that God is the Creator of man—that his origin is not thus to be traced.

In brief, as already indicated, I concur with the majority in the conclusion (1) that this case must be reversed for the error of the judge in fixing the fine, (2) that a *nolle prosequi* should be entered, and (3) that the act is constitutional as within the powers of the Legislature as the employer of its teachers. However, I go further

and find the act constitutional for additional reasons rested upon the view that the act fairly construed is limited to the prohibition of the teaching of any theory of evolution only which denies the Divine creation of man, without regard to details of religious belief, or differing interpretations of the story as taught in the Bible. In this view the constitutionality of the act is sustained, but the way is left open for such teaching of the pertinent sciences as is approved by the progressive God recognizing leaders of thought and life.

McKINNEY, J. (dissenting).

An elemental rule of statutory construction, which is well stated by Mr. Justice SUTHERLAND in delivering the opinion of the Supreme Court of the United States in *Connally* v. *General Construction Company,* 46 Sup. Ct. Rep., 126, is as follows:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. *International Harvester Co.* v. *Kentucky,* 234 U. S. 216, 221, 34 S. Ct., 853, 58 L. Ed., 1284; *Collins* v. *Kentucky,* 234 U. S., 638, 34 S. Ct., 924, 58 L. Ed., 1510."

Applying the foregoing rule to the statute here involved, I am of the opinion that it is invalid for uncertainty of meaning. I, therefore, respectfully dissent from the contrary holding of my associates.